In the Matter of the Complaint of UNTERWESER REEDEREI, GMBH.
ZAPATA OFF-SHORE COMPANY, Plaintiff-Appellee,

v.

M/S BREMEN and Unterweser Reederei GMBH, Defendants-Appellants.

No. 27497.

United States Court of Appeals, Fifth Circuit.
June 19, 1970.

David C. Kerr, Jack C. Rinard, Tampa, Fla., Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, J. Y. Gilmore, Jr., Warren Faris, New Orleans, La., for defendants-appellants.

Dewey R. Villareal, Jr., Tampa, Fla., James K. Nance, Houston, Tex., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

Unterweser Reederei, GMBH (Unterweser), seeks review of an order of the district court denying a stay of the limitation action Unterweser had filed in that court and enjoining Unterweser from proceeding further with litigation concerning the same subject matter in an English court. The limitation action was brought after Zapata Off-Shore Company (Zapata) filed a complaint in admiralty against Unterweser and its tug Bremen.

Unterweser, a German corporation, contracted with Zapata, a Delaware corporation, with its principal place of business in Houston, Texas, to tow Zapata's drilling barge Chaparral[1] from Venice, Louisiana to Ravenna, Italy. The towage contract contained a forum selection clause providing that any dispute must be litigated before the High Court of Justice in London, England. On 5 January 1968, the Unterweser tug Bremen[2] departed Venice, Louisiana with the Chaparral in tow. During the morning of 9 January 1968, the Chaparral suffered a casualty while proceeding in the Gulf of Mexico. Pursuant to instructions from Zapata, Bremen made for Tampa Bay, the nearest port. Promptly upon arrival, Bremen was arrested by a United States Marshal and her master served with a copy of Zapata's complaint seeking $3,500,000 in damages from Bremen and Unterweser.[3]

Unterweser filed a motion praying in the alternative that the district court (1) dismiss for want of jurisdiction, (2) decline jurisdiction on the basis of forum non conveniens, or (3) stay further prosecution of the action.[4] Unterweser

1. A self elevating drilling barge, 180 feet in length and 205 feet in breadth, of 4750 gross tons.

2. A deepsea tug, 178 feet in length, 40 feet in beam, of 1200 gross tons and 7500 horsepower. Bremen was built and registered in Germany and manned by a crew of 23.

3. Bremen was released from arrest on 26 January 1968, after Unterweser had furnished a letter of undertaking in the amount of $3,500,000.

4. This motion was denied by the district court on 29 July 1968, after Unterweser had filed its limitation action. Unterweser sought to have this order certified

subsequently instituted an action against Zapata in the High Court of Justice in London, claiming moneys due under the towage contract and damages for breach of contract. Zapata was served with the summons of that court; it appeared and moved that the English court dismiss its process. The High Court of Justice denied Zapata's motion holding that it had jurisdiction of the action. This determination was affirmed by the English Court of Appeal which held the forum selection provision of the contract to be reasonable and found no circumstances which would require it to deny enforcement of the agreement.

Before the English Court of Appeal had rendered the above decision, Unterweser filed a complaint in the district court seeking exoneration or limitation of liability arising from the casualty.[5] Consequently the district court entered the usual injunction restraining claimants from proceeding outside the limitation court regarding the events of 9 January 1968. Zapata filed its claim in the limitation proceedings asserting the same cause of action as in its original action. Unterweser filed objection to Zapata's claim and counterclaimed against Zapata alleging the same claims embodied in its English action plus an additional salvage claim.

Zapata moved for an injunction restraining Unterweser from litigating further in the High Court of Justice. Unterweser moved to stay its own limitation proceeding pending a determination of Unterweser's suit in the English court. The district court denied the requested stay and enjoined Unterweser from proceeding in any other court regarding the same matter prior to a determination of the limitation action.[6] Un-

terweser appeals from these orders, and we affirm.

## I

We shall first comment on the power of the district court to restrain Unterweser from proceeding with its action in England. A court of equity has the traditional power to enjoin parties, properly before it, from litigating in another court. This power has been exercised where the foreign litigation would: (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations.[7] We must now determine whether this traditional power of the Chancellor appertains to a district court sitting in a limitation proceeding.

Prior to the decision below there has been scant judicial discussion of the power of an admiralty court to enjoin a party bringing a limitation action from contemporaneous litigation in foreign courts. Our research has added little of significance to the authority cited by the district court. The principal decision on the question was rendered by the Second Circuit in *The Salvore*.[8] In that case, the owners of cargo damaged while on board the Salvore brought a libel in the district court. The Salvore's owner sued the cargo claimants in an Italian court for abuse of process, and subsequently brought a limitation proceeding in the district court. On a motion by the cargo claimants, the district court held that it was without power to stay the limitation proceeding or to compel the shipowner to discontinue its Italian suit. In reversing, the Second Circuit relied on the Su-

in order to take an immediate appeal pursuant to 28 U.S.C. § 1292(b). The district court refused to certify the order, finding that the question had been mooted by the filing of Unterweser's limitation action and the consequent stay of Zapata's original action.

5. See 46 U.S.C. § 185 et seq.

6. In re Unterweser Reederei, GMBH, 296 F.Supp. 733 (M.D.Fla.1969).

7. 7 J. Moore, Federal Practice § 65.19 (2d ed. 1953).

8. 36 F.2d 712 (2d Cir. 1929).

preme Court's description of a limitation proceeding as "the administration of equity in an admiralty court; look[ing] to a complete and just resolution of a many cornered controversy." [9] It stated:

> The limitation proceeding was an appeal to a court of admiralty, which is a court of equity, * * * and the appellee [shipowner], seeking equity, should willingly do equity. * * * It must be willing to bring in all the controversies in the limitation proceedings, for it has invoked the court's aid.[10]

In A. C. Dodge, Inc. v. J. M. Carras, Inc.,[11] the Second Circuit relied on its *Salvore* decision in affirming an order of the district court dissolving an injunction entered against claimants in the shipowner's limitation proceeding, and providing that it would be reinstituted only if the shipowner obtained a stay of an action which it was simultaneously pursuing in another federal court. Unterweser seeks to distinguish these cases on the ground that neither involved an injunction of the sort issued in the present case. In *Salvore* and *Dodge*, the courts sought to coerce the shipowner by conditioning the continuance of the injunction, that restrained claimants from litigating outside the limitation court, on

voluntary forebearance of the shipowner's foreign action. We find no implication in these cases which would influence us to hold that district courts are impotent to accomplish directly what these courts sought to effect circuitously. To the contrary, the court in *Salvore* expressly stated:

> The court first securing jurisdiction has the authority and power of enjoining the parties to the litigation from proceeding in another jurisdiction. And the court has an undoubted authority to control all persons and things within its own territorial limits.[12]

Unterweser emphasizes the third case of the trilogy cited in the district court's opinion, Petition of A/S J. Ludwig Mowinckels Rederi.[13] There the district court refused to enjoin litigation in an English court by a shipowner participating in a limitation proceeding before the district court. Though there is indication in the opinion that the *Mowinckels* court felt itself limited to the type of order fashioned in *Salvore* and approved in *Dodge*, we agree with the position of the district court below that *Mowinckels* was based on a determination that *any* restraint of the shipowner was improper under the attendant circumstances.

9. Id. at 713, quoting Hartford Acci. & Indemn. Co. v. Southern P. Co., 273 U.S. 207, 216, 47 S.Ct. 357, 71 L.Ed. 612 (1927).

10. 36 F.2d at 713. An analogous proposition is embodied in the decision of this court in Beal v. Waltz, 309 F.2d 721 (5th Cir. 1962). There, this court upheld the district court's refusal to modify its injunction to allow the shipowner to plead a favorable state court judgment as res judicata in the limitation proceedings he had filed in the district court. This court stated:
   There was no equity in the position of appellant. He could not successfully claim the right in the Federal limitation proceeding to restrain claimant in the state court suit, and still obtain the advantage of the litigation there * * *. 309 F.2d at 724.

11. 218 F.2d 911 (2d Cir. 1955). This case arose from a collision in the Dela-

ware River. Appellant shipowner filed a limitation petition in the United States District Court for the Eastern District of New York. The owner of the other vessel involved in the collision moved that the court dissolve its prior injunction because appellant was prosecuting a libel against it in Federal District Court in Maryland.

12. 36 F.2d at 714.

13. 268 F.Supp. 682 (S.D.N.Y.1967). The complex litigation involved in this case arose from a collision off the coast of France. Many of the claims were being litigated in England, and cargo claimants were proceeding with actions against both vessels in French courts. As the court below properly observed, the *Mowinckels* case was influenced by the fact that no one court could obtain control of the entire litigation arising from the collision.

Since the district court entered its orders below, *Mowinckels* has been affirmed by the Second Circuit.[14] The opinion on appeal supports the interpretation given *Mowinckels* by the district court in the instant case. Citing *Salvore* and *Dodge* with approval, the Second Circuit stated:

> There can be no question * * * that one purpose of the Limitation Act is a concursus or concourse of claimants, and that in an appropriate situation the court may have power to enjoin persons within its jurisdiction with respect to their activities abroad.[15]

The opinion makes it clear that the district court's action was based on the equitable considerations of that case, and implies no general limitation on a district court's equitable powers in a limitation action.

> Concededly, the lower court could have restrained Mowinckels' continuance of its collision action in the English courts. But it declined to do so. We can find no fault in this decision. Under the circumstances of this case the lower court's decision was an appropriate exercise of its discretion.[16]

■ Unterweser also draws our attention to the proposition, quoted by the district court in Mowinckels from British Transport Commission v. United States,[17] that:

> "[N]o compulsion could be exerted on foreign claimants to file claims" and * * * "an injunction against suits being filed in foreign jurisdictions would be ineffective unless comity required its recogition." [18]

This practical observation is not pertinent to the present situation. Unterweser is not merely a potential claimant outside the jurisdiction of the district court; it is a party which has invoked, albeit reluctantly, that very jurisdiction. Though a domestic court has no power to restrain the courts of a foreign nation, it has admitted power to deal with litigants properly before it. An exercise of the latter power is not the assumption of the former.[19] With both Unterweser and substantial amounts of its assets before the district court, it need not resort to comity to enforce its order.

■■ Unterweser also seeks to distinguish the foregoing authorities since none of these cases involved a forum selection clause. We are of the opinion that this clause is only relevant in determining whether the district court properly refused to stay the limitation proceeding, and, on the facts of this case, does not affect the power of the district court to grant injunctive relief. The implications of the forum clause will be considered in the next section of this opinion. For the moment we conclude that Unterweser's petition for limitation subjects it to the full equitable powers of the district court.[20] In a proper case, these include the power to enjoin a petitioning shipowner from litigating in a foreign forum. As this court observed in Guillot v. Cenac Towing Co.,[21] "In the Admiralty the Chancellor now goes to sea and has adequate equitable reserves."

## II

■ Unterweser contends that the district court erred in refusing to stay

14. Petition of Bloomfield S. S. Co., 422 F.2d 728 (2d Cir. 1970).

15. *Id.*

16. *Id.*

17. 354 U.S. 129, 142, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957).

18. 268 F.Supp. at 690. Also see In re Bloomfield S. S. Co., 227 F.Supp. 615 (E.D.La.1964), aff'd sub nom., Bloomfield S. S. Co. v. Haight, 363 F.2d 872 (5th Cir. 1966), cert. denied, 386 U.S. 913, 87 S.Ct. 864, 17 L.Ed.2d 785 (1967).

19. Steelman v. All Continent Corp., 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085 (1937); 7 J. Moore, *supra* note 4.

20. Petition of A/S J. Ludwig Mowinckels Rederi, 268 F.Supp. 682, 689–690 (S.D. N.Y.1967). *See* British Transp. Comm'n v. United States, 354 U.S. 129, 77 S.Ct. 1103 (1957).

21. 366 F.2d 898, 904 (5th Cir. 1966).

the limitation action pending a determination of its English suit. It urges that the stay was required by the forum selection clause of the towage contract, which provides: "Any dispute arising must be treated before the London Court of Justice."

At this point it is helpful to pare two questions that are not involved in this appeal. The district court had jurisdiction of the limitation action. We do not understand Unterweser to seriously contend that this jursdiction was defeated by the presence of the forum clause.[22] Neither are we asked to determine whether Zapata has breached the towage contract by filing the libel in the district court. The question we must decide is whether the district court was obliged to decline to exercise admitted jurisdiction under the facts of the present case.

In Carbon Black Export, Inc. v. The SS Monrosa,[23] this court reversed an order of the district court declining jurisdiction of a libel filed by a cargo shipper. The district court, relying on Wm. H. Muller & Co. v. Swedish American Line, Ltd.,[24] had upheld a forum selection clause contained in the bills of lading designating Genoa, Italy as the exclusive situs for legal proceedings,[25] finding that the libellant had not shown the clause to be unreasonable. This court held that the forum clause did not apply to *in rem* proceedings. In holding that the district court erroneously declined *in personam* jurisdiction over the shipowner, this court stated:

> In essence, the motion [to decline jurisdiction] was based upon Clause 27 as buttressed by the doctrine of forum non conveniens. Any consideration of such a question starts with the universally accepted rule that agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced.[26]

This court professed no comment on the Second Circuit's decision in *Muller* distinguishing it on its facts. The Supreme Court granted certiorari to resolve an indicated conflict between *Carbon Black* and *Muller*.[27] In SS Monrosa v. Carbon Black Export, Inc.,[28] the Court dismissed the writ as improvidently granted though it approved this court's interpretation of the forum clause as having no application to *in rem* actions. Any remaining antagonism between the two opinions was relieved when *Muller* was overruled by the Second Circuit sitting en banc in Indussa Corp. v. SS Ranborg.[29]

---

22. See 6A A. Corbin, Contracts § 1445 (1962). Also see note 35 *infra*.

23. 254 F.2d 297 (5th Cir. 1958), cert. dismissed, 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723 rehearing denied 359 U.S. 999, 79 S.Ct. 1115, 3 L.Ed.2d 986 (1959).

24. 224 F.2d 806 (2d Cir. 1955). In a cargo consignee's libel against the carrier, the Second Circuit held that a forum clause contained in the bill of lading should be respected unless shown to be unreasonable. See note 29 *infra*.

25. The forum clause in *Carbon Black* provided:
   Clause 27—Also, that no legal proceedings may be brought against the Captain or ship owners or their agents in respect to any loss of or damage to any goods herein specified, except in Genoa, it being understood and agreed that every other Tribunal in the place or places where the goods were shipped or landed is incompetent, notwithstanding that the ship may be legally represented there.

26. 254 F.2d at 300–301. The position of this court in *Carbon Black* reflects what is apparently the majority view regarding forum selection clauses. Annot., 56 A.L.R.2d 300 (1957); 1 E. Benedict, Admiralty § 22a (6th ed. 1940, Supp. 1968).

27. 358 U.S. 809, 79 S.Ct. 43, 3 L.Ed.2d 54 (1958).

28. 359 U.S. 180, 79 S.Ct. 710 (1959).

29. 377 F.2d 200 (2d Cir. 1967). The *Indussa* Court held that *Muller* was inconsistent with the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315. COSGA also applied to the shipment in *Carbon Black*, but we are unable to read that case as applying only to such shipments.

In Insurance Co. of North America v. N. V. Stoomvaart-Maatschappij,[30] the district court was requested to decline jurisdiction on the basis of a forum clause which was more broadly drawn than the clause in *Carbon Black* and analogous to the provision in the instant contract.[31] In denying the request the court stated:

> Here the jurisdictional provision involved in Clause 22 refers to *"Any action,"* obviously referring to both *in personam* and *in rem* actions. Nevertheless, the Fifth Circuit's holding in Carbon Black is applicable and such an attempt to oust the Court of its jurisdiction in advance will be stricken herewith as being contrary to public policy and unenforceable.[32]

As one commentator has reluctantly observed, the *Carbon Black* decision, "At the very least * * * stands for the proposition that a choice of forum clause will not be enforced unless the selected state would provide a more convenient forum than the state in which suit is brought." [33] We conclude that the forum selection clause, in and of itself, did not compel the district court to stay proceedings in the limitation action so that the parties might litigate in England pursuant to its provisions.

It was within the sound discretion of the district court to decline jurisdiction on the basis of forum non conveniens.[34] But apart from the forum selection clause itself the circumstances supported a retention and determination by the district court.[35] Though the towage contract envisioned a long voyage with potential exposure to the jurisdiction of numerous states, the flotilla never escaped the Fifth Circuit's mare nostrum, and the casualty occurred in close proximity to the district court. A considerable number of potential witnesses, including Zapata's crewmen who were aboard the Chaparral, reside in the gulf cost area of the United States. Preparations for the voyage were made in this area, and, after the casualty, inspection of the damage and repair work was conducted there. The testimony of Bremen's crewmen, residing in Germany, is available by way of depositions already taken in the proceedings. The only other nation having significant contacts with, or interest in, the controversy is Germany.[36] England's only relationship is the designation of her courts in the forum clause.

Zapata, the only claimant in the limitation action, is a United States citizen. The discretion of the district court to

---

30. 201 F.Supp. 76 (E.D.La.1961).

31. The clause in Insurance Co. of N. Am. provided:
   Clause 22—Any action with regard to any dispute or claim arising under this bill of lading and the contract evidenced thereby shall be brought before the Court at Amsterdam to the exclusion of any other court unless the Carrier appeals to another jurisdiction or voluntarily submits himself thereto.

32. 201 F.Supp. at 78.

33. Reese, The Contractual Forum: Situation in the United States, 13 Am.J. Com.L. 187, 191–192 (1964).

34. Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A., 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). *See* Canada Malting Co. v. Paterson S. S., Ltd., 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932).

35. In a footnote to its brief, Unterweser states:

   At oral argument on its Motion, counsel advised the District Court that Unterweser did not intend to press its Motion for Dismissal for Lack of Jurisdiction, nor did it intend to press the *forum non conveniens* argument. It was recognized that the Court did have *in rem* jurisdiction over BREMEN, and it was further recognized that after the fact inconvenience to the parties was not controlling upon the question of enforceability of the contract clause providing for a London forum and English law. Furthermore, upon analysis, there was no strong balance of convenience favoring either the U. S. forum or the London forum, *quite apart from consideration of the Towage Contract.* (Emphasis in original)

36. Unterweser is a German national. The Bremen was built and is registered in Germany and her 23 crewmen are all German nationals. The towage contract was executed by Unterweser in Bremen, Germany.

remand the case to a foreign forum was consequently limited.[37] This is especially true since, as the court noted, there are indications that Zapata's substantive rights will be materially affected if the dispute is litigated in an English court. The towage contract contained the following exculpatory provisions:

1. * * * Urag [Unterweser], their masters and crews, are not responsible for defaults and/or errors in the navigation of the tow.

2.(b) Damages suffered by the towed object [Chaparral] are in any case for account of its owners.

These provisions are apparently contrary to public policy and unenforceable in American courts.[38] However, according to the affidavit of F. D. Bateson, Zapata's English maritime law expert, these clauses would be held prima facie valid and enforceable by an English court.[39] The district court was entitled to consider that remanding Zapata to a foreign forum, with no practical contact with the controversy, could raise a bar to recovery by a United States citizen which its own convenient courts would not countenance.

Moreover, it is doubtful that Unterweser would benefit even if we ignored *Carbon Black* and somehow resurrected the *Muller* rule. The minority of jurisdictions which recognize forum selection provisions, as prima facie valid, deny enforcement where the clause is shown to be unreasonable.[40] One commentator,

advocating this position, elaborated on the question of reasonableness:

[E]ffect should be denied the clause if there is reason to believe that the courts of the selected state would deal unfairly with the plaintiff or would deny him relief to which he was entitled,

* * * * * *

Likewise, effect should be denied the clause if the selected state is a seriously inconvenient one for the trial of the action, as might be true in a situation where the occurrence sued upon took place in a distant place from which, if the trial were to be held in the selected state, it would be necessary to transport large numbers of witnesses.[41]

On the facts of the present case the district court did not choose to disturb the original choice of forum.[42] We do not feel it abused its discretion in this regard.

### III

Having declined to stay the limitation action, we feel it was proper for the district court to restrain Unterweser from proceeding in any other court. The Supreme Court, regarding limitation proceedings, has stated:

[T]his court has by its rules and decisions given the statute a very broad and equitable construction for the purpose of carrying out its purpose, and for facilitating a settlement of the

---

**37.** Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A., 339 U.S. 684, 70 S.Ct. 861 (1950); Burt v. Isthmus Dev. Co., 218 F.2d 353 (5th Cir.), cert. denied, 349 U.S. 922, 75 S.Ct. 661, 99 L.Ed. 1254 (1955). Annot., 90 A.L.R.2d 1109 § 9 at 1125 (1963).

**38.** Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963); Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955).

**39.** The affidavit stated in part:
It is my opinion that the above quoted exculpatory clauses, under English law, are not against the public policy of England, and would be held to be

prima facie valid and enforceable by an English Court should a cause of action be filed in England either by way of original action or by way of counterclaim. * * *
Unterweser does not take issue with Mr. Bateson's interpretation of English law.

**40.** Central Contracting Co. v. Maryland Cas. Co., 367 F.2d 341 (3d Cir. 1966); General Motors Overseas Operation Div. v. S. S. Goettingen, 225 F.Supp. 902 (S.D.N.Y.1964); Chemical Carriers, Inc. v. L. Smit & Co.'s Internationale Sleepdienst, 154 F.Supp. 886 (S.D.N.Y.1957).

**41.** Reese, *supra* note 33 at 189.

**42.** Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

whole controversy over such losses as are comprehended within it, and that all the ease with which right can be adjusted in equity is intended to be given to the proceeding.[43]

Unlike the situation faced by the district court in Petition of A/S J. Ludwig Mowinckels,[44] the instant case involves only two contestants, both of whom are properly before a court of competent jurisdiction. It was within the court's discretion to determine, as it did, that allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in "inequitable hardship" and "tend to frustrate and delay the speedy and efficient determination of the cause." [45] On the facts of the present case, we find no abuse of that discretion.

In accordance with the foregoing, the order of the district court is affirmed.

WISDOM, Circuit Judge (dissenting).

"Problems arising in a court call for a perceptive awareness not only of what courts are for but of what a legislature is for and sometimes also of what an administrative agency is for *and of what matters can best be left to private decision*." H. Hart & A. Sacks, The Legal Process iii (tent. ed. 1958) (emphasis supplied).

In this case we deal with an agreement made between two responsible corporations involved in an international transaction. This transaction was no run-of-the-mine project. The subject of the contract was the towing of a six million dollar self-elevating oil drilling barge from the Mississippi to the Adriatic. Unterweser, the tower, is a corporation organized and domiciled in Germany. Zapata, owner of the rig, is a Delaware corporation domiciled in Texas. Zapata solicited bids from several towing companies before engaging Unterweser. Zapata then requested Unterweser to furnish a written contract for its perusal. Unterweser, which generally inserts a provision for German jurisdiction and application of German law, specified an English forum and English law as a reasonable compromise with an American firm in a transaction requiring an oil rig to traverse the Gulf of Mexico, the Atlantic, the Mediterranean, and the Adriatic. After reviewing the suggested contract, Zapata made several changes in the document before executing it. Presumably Zapata could have rejected the contract outright and accepted one of the other bids. Yet the Court holds that these corporations of diverse nationalities, performing a contract in the vicinity of many jurisdictions, could not effectively agree on which forum they would use to regulate their relationship and settle their disputes (probably the best method of ensuring a correct application of the governing law. Reese, The Contractual Forum: Situation in the United States, 13 Am. J.Comp.L. 187, 189 (1964)). Inevitably such a holding poses a serious disability to certainty in the ever-growing international trade. Where contract relations permit advance planning in transnational contracts, "there are evident advantages in such certainty, in avoiding later jurisdictional disputes. Transnational commercial activities would thereby be facilitated". H. Steiner & D. Vagts, Transnational Legal Problems 727 (1968).[1]

If Carbon Black Export, Inc. v. The SS Monrosa, 5 Cir. 1958, 254 F.2d 297, cert. dismissed, 1959, 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723, requires the result the Court reaches here, then I

---

43. Hartford Accident & Indem. Co. v. Southern P. Co., 273 U.S. 207, 215, 47 S.Ct. 357, 359, 71 L.Ed. 612 (1927).

44. 268 F.Supp. 682 (S.D.N.Y.1967), see note 13 *supra*.

45. *See* Petition of Bloomfield S.S. Co., 422 F.2d 728 (2d Cir. 1970).

1. See Nadelmann, The Hague Conference on Private International Law & the Validity of Forum Selecting Clause, 13 Am. J.Comp.L. 157 (1964) ; Lenhoff, The Parties' Choice of a Forum : "Prorogation Agreements", 15 Rutgers L.Rev. 414 (1961).

believe that case is outmoded. The *Carbon Black* Court [2] believed "the universally accepted rule" to be that forum agreements are unenforceable. I cannot tell whether the majority here reads *Carbon Black* at its broadest, that forum agreements are necessarily "contrary to public policy and will not be enforced", 254 F.2d at 301, or at its narrowest, "that a choice of forum clause will not be enforced *unless the selected state would provide a more convenient forum than the state in which suit is brought*". Reese at 192 (emphasis supplied).[3] Believing as I do that *Carbon Black's* rule is erroneous both histori-

2. In *Carbon Black*, an American exporter sued both the vessel and the vessel's owner, an Italian corporation, for damage to and nondelivery of a cargo of carbon black placed on board the S.S. Monrosa in the United States for shipment to Italy. The defendant moved for dismissal because of a provision in the contract that any action for loss or damage to the goods should be brought in Genoa. This Court reversed the district court's decision to grant the motion, holding that the in rem action did not come within the language of the forum clause. With respect to the action in personam we stated that "the universally accepted rule [is] that agreements in advance of controversy * * * to oust the jurisdiction of the courts are contrary to public policy and will not be enforced". The Supreme Court at first granted certiorari to resolve an apparent conflict with Wm. H. Muller & Co. v. Swedish American Line, Ltd., 2 Cir. 1955, 224 F.2d 806, cert. denied, 1955, 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793 then dismissed certiorari as improvidently granted, finding that the clause in *Carbon Black* did not include an in rem action and refusing to rule on the clause's validity with regard to the in personam action. 359 U.S. 180, 79 S.Ct. 710, 3 L. Ed.2d 723. *Muller* had said that courts should enforce a forum clause unless it was unreasonable or prohibited by statute.

3. Perhaps the original *Carbon Black* opinion is largely responsible for that ambiguity. After presenting its universal rule, *Carbon Black* stated that it neither espoused nor rejected the Second Circuit's position in *Muller*. *Carbon Black* referred to factual distinctions from Muller which tended to show that the operation of the *Carbon Black* forum clause was less reasonable than *Muller's*, then concluded that the doctrine of forum non conveniens did not justify declining jurisdiction because the balance was not strongly in favor of the defendant. Thus, it is unclear whether the factual distinctions buttress the conclusion that forum non conveniens did not apply, or whether *Carbon Black* was somehow retreating from the universality of its principle. I believe the same ambiguity is reflected in Insurance Com-

pany of North America v. N.V. Stoomvaart-Maatschappij "Oostzee", E.D.La. 1961, 201 F.Supp. 76. There the district court concluded that *Carbon Black* required forum clauses to "be stricken herewith as being contrary to public policy and unenforceable", 201 F.Supp. at 78, but proceeded to analyze the reasonableness of the particular clause in the circumstances presented.

There are other indications that this Court has not taken such a harsh view of forum clauses as *Carbon Black* proposes. In Anastasiadis v. S.S. Little John, 5 Cir. 1965, 346 F.2d 281, cert. denied, 1966, 384 U.S. 920, 86 S.Ct. 1368, 16 L.Ed.2d 440 for example, we affirmed the district court's decision to decline jurisdiction of an in rem suit. There, a Greek seaman had contracted in Greece for employment on a vessel of Liberian registry. Although a Liberian corporation owned the vessel, that corporation was in turn wholly owned and controlled by an American corporation, in turn wholly owned and controlled by a United States citizen. The contract, written in Greek, provided that the seaman would join the vessel at Houston, Texas. But it stated that Greek law would govern disputes and designated the Greek courts at Piraeus as the forum. When the seaman joined the ship at Houston, he found conditions unsatisfactory and sued in a Texas district court for breach of contract and tort. Depositions of witnesses were taken in the United States. This Court concluded that even though the district court undoubtedly had jurisdiction, it also had discretion to decline jurisdiction of a controversy between foreigners. Although a nominal foreign registry is often pierced where American laws are to be enforced against a ship beneficially owned by Americans, the Court declined to do so. It said:

The contract in the instant case provided not only that Greek law would be determinative but also that the Greek courts were to be the proper forum for the litigation of claims arising out of the contract. We see no reason, in the circumstances of this case, why this provision should not be given effect in the absence of any suggestion in the record

cally and analytically, however, I must reject both the broad and the narrow formulations as unsatisfactory.[4]

I think the rule should be "outright recognition of the parties' autonomy * * * if tempered by the court's continuing power to refuse effect to 'unreasonable' prorogation [choice of forum] agreements, and subject to specific legislation limiting access to the courts of the forum". A. Ehrenzweig, Conflict of Laws § 41, at 153 (1962). Or, as the Restatement puts it, "[t]he parties' agreement as to the place of the action cannot oust a state of judicial jurisdiction, but such an agreement will be given effect unless it is unfair or unreasonable". Restatement (Second) of Conflict of Laws § 80 (Proposed Off. Draft, 1967).[5]

that Greece is an inconvenient forum or that Greek law provides an inadequate remedy.

346 F.2d at 284. It is perhaps this less rigorous view of forum clauses and *Oostzee's* analysis of the unreasonable aspects of the forum clause there that have prompted the observation by some commentators that cases striking down forum clauses in the Fifth Circuit emphasize the "unreasonable character" of the particular clause. *See, e.g.,* Steiner v. Vagts at 734.

4. Perhaps *Carbon Black* could be distinguished or limited to its facts. The Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315, applied there, and the Second Circuit has recently found that § 3(8) of that Act makes forum clauses unenforceable where it applies. Indussa Corp. v. S. S. Ranborg, 2 Cir.1967, 377 F.2d 200; *accord,* G. Gilmore & C. Black, The Law of Admiralty § 3–25, at 125 n. 23 (1957); 40 U.Col.L.Rev. 159 (1967); 8 Va.J.Int. L. 161 (1967); Note, Enforcement & Effect of the Jurisdiction Clause in Admiralty, 34 St. John's L.Rev. 72, 76–79 (1959). *But see* 9 Harv.Int.L.J. 333, 339–40 (1968); 14 Wayne L.Rev. 609, 614–16 (1968); 45 Corn.L.Q. 364, 372 (1960). *Carbon Black,* moreover, specifically stated that it neither espoused nor rejected *Muller,* a case that enforced a forum clause where there was no evidence of undue bargaining pressure and the clause was not unreasonable. Finally, *Carbon Black* dealt with the specification of an Italian forum for a contract printed in English adopting American law (COGSA) and executed in the United States. But I tend to agree with the majority that *Carbon Black's* language and reasoning, even at their narrowest, are broad enough to cover this case, and I feel that it must be overruled.

5. The Restatement of Contracts § 558 (1932) is sometimes read the same way, *see* Krenger v. Pennsylvania R.R., 2 Cir. 1949, 174 F.2d 556, 561 (L. Hand, J., concurring), presumably because the Restatement specifies that agreements to litigate in federal rather than state court or vice versa are illegal, but outlaws other agreements limiting the tribunal only if they do so "unreasonably".

The presumpion quoted in text from the Restatement of Conflicts has changed since an earlier draft. In 1957 the comparable section read:

The parties' agreement as to the place of suit cannot prevent the exercise of judicial jurisdiction by a State. A provision to this effect will, however, be given effect by a court if it is deemed fair and reasonable.

Restatement (Second) of Conflict of Laws § 117a (Tent. Draft No. 4, 1957).

The Comment to the present § 80 is a useful synopsis of my position in this dissent. As the rationale for § 80, it states:

Private individuals have no power to alter the rules of judicial jurisdiction. They may not by their contract oust a state of any jurisdiction it would otherwise possess. This does not mean that no weight should be accorded a provision in a contract that any action thereon shall be brought only in a particular state. Such a provision represents an attempt by the parties to insure that the action will be brought in a forum that is convenient for them. A court will naturally be reluctant to entertain an action if it considers itself an inappropriate forum. And the fact that the action is brought in a state other than that designated in the contract affords ground for holding that the forum is an inappropriate one and that the court in its discretion should refuse to entertain this action. Such a provision, however, will be disregarded if it is the result of overreaching or of the unfair use of unequal bargaining power or if the forum chosen by the parties would be a seriously inconvenient one for the trial of the particular action. On the other hand, the provision will be given effect, and the action dismissed, if to do so would be fair and reasonable.

## I.

The courts' distaste for forum clauses has usually been linked to a supposed longstanding judicial antipathy to arbitration agreements. Ehrenzweig § 41, at 148. Most judges and commentators have attributed this attitude to "the contests of the different Courts in ancient times for extent of jurisdiction, all of them being opposed to anything that would altogether deprive every one of them of jurisdiction". Scott v. Avery, 5 H.L.Cas. 811, 853, 40 Rev.R. 392, 413 (1856) (Lord Campbell). But more recently scholars have demonstrated that the supposed antagonism to arbitration agreements was not so entrenched and that its apparent cause, the desire for fees, was erroneously ascribed. 6A A. Corbin, Contracts § 1433, at 391–95 (1962); Ehrenzweig § 42, at 153 & n. 26; Sayre, Development of Commercial Arbitration Law, 37 Yale L.J. 595 (1928).[6] Instead, until the Statute of Fines and Penalties, 8 & 9 Wm. III (1687), made the remedy impractical, courts consistently enforced arbitration agreements through the vehicle of penal bonds. With this remedy gone, pressure mounted to make arbitration agreements irrevocable. The courts resisted not on account of the fees involved, but because "arbitration proceedings were not regulated and the parties' only effective protection against

an unfair or insufficient hearing by the arbitrators was in revoking the submission before the award was given". Sayre at 605.[7] Not until the nineteenth century was the revocability of arbitration agreements simply premised on the courts' opposition to "ouster" from their jurisdiction. Ehrenzweig § 42, at 155.[8] And then legislative action both in England and in the United States encouraged the courts to take a more benevolent view of such agreements.[9]

The strength of this misconception, however, seems to have contributed to American courts' generally negative attitude toward forum clauses. Home Insurance Company of New York v. Morse, 1874, 20 Wall. (87 U.S.) 445, 22 L.Ed. 365, 368, concluded that the authorities showed "agreements in advance to oust the courts of jurisdiction conferred by law [to be] illegal and void". The Court quoted at length from Scott v. Avery and from Mr. Justice Story's Commentaries on Equity Jurisprudence (§ 670) that

> where the stipulation, though not against the policy of the law, yet is an effort to devest the ordinary jurisdiction of the common tribunals of justice, such as an agreement in case of dispute to refer the same to arbitration, a court of equity will not any more than a court of law interfere to enforce the agreement   *   *   *.[10]

6. If ever there had been any substance to the fees argument, it should have no force in our Circuit where we are faced with crowded and constantly growing dockets (especially since we are not paid by the case).

7. Cf. 6A Corbin § 1433, at 391–395. Forum clauses are sometimes referred to as preferable in this respect, because a judicial remedy is still available. Ehrenzweig, § 42, at 152.

8. Sayre at 604 identifies an eighteenth century case, Kill v. Hollister, 1 Wils. 129 (1746) as the first case actually to speak in these terms, but the majority of cases were later.

9. Common Law Procedure Act of 1954, 17 & 18 Vict., c. 125, § 11 (permitting use of the courts' discretion); Arbitration Act of 1889, 52 & 53 Vict. c. 49; Georgia Ar-

bitration Act, Ga.Laws 1855–1856, 222–224. Action in the United States did not become significant until after Judge Hough's sardonic opinion in United States Asphalt Ref'g Co. v. Trinidad Lake Petroleum Co., S.D.N.Y. 1915, 222 F. 1006. See Sayre at 612. But that opinion prompted enactment of arbitration statutes. See e.g., Gilbert v. Burnstine, 1931, 255 N.Y. 348, 174 N.E. 706, 707: "Settlements of disputes by arbitration are no longer deemed contrary to our public policy. Indeed, our statute encourages them."

10. The heart of Morse was the constitutional issue of the line between state and federal jurisdiction. A Wisconsin statute required that before doing business in the state, all foreign corporations must sign agreements not to remove a suit from state to federal court. The Home Insur-

In truth, however, courts had not uniformly disfavored forum clauses. Decisions enforcing the parties' designation of a forum date back to 1796. Gienar v. Meyer, 126 Eng.Rep. 728 (C.P. 1796) (Dutch seaman suing Dutch seamaster for wages in English court; *held,* ship's articles specifying the code of Rotterdam and the courts of Holland were enforceable). They continue through the nineteenth century despite the fear of "ouster". Indeed, the example of arbitration influenced the English courts to deal kindly with forum clauses. Law v. Garrett, 8 Ch.D. 26 (C.A.1878), for example, spoke in terms of arbitration in a case involving the stipulation of a Russian court in St. Petersburg. Lord Justice Baggallay observed that the court entirely agreed with Willesford v. Watson, L.R. 8 Ch. 473 (1870), that where "parties choose to determine for themselves that they will have a forum of their own selection instead of resorting to the ordinary Courts, a *prima facie* duty is cast upon the Courts to act upon such arrangement". 8 Ch.D. 26, 37. The agreement did not "oust" the court of jurisdiction, but did give it discretion to stay the proceedings. The English courts have continued to follow the principle of Law v. Garrett.[11] Today their rule appears to be enforcement of a forum clause unless the particular case militates against it. The Vestris, 43 Lloyd's List L.R. 86 (Adm.Div.1932). "[A] forum selection agreement will, *prima facie,* be respected; the burden of proof lies upon the party resisting the application for a stay, and he must convince the court that a stay should be granted." Cowen & Mendes da Costa, The Contractual Forum: Situation in England & the British Commonwealth, 13 Am.J.Comp. L. 179, 186 (1964).

American courts, however, have generally retained their hostility to forum agreements. If the law is to be applied simply by tallying up the number of precedents that have not been overruled, then the majority opinion here is undoubtedly correct.[12] But important incursions have been made. In 1949, Judge Learned Hand observed:

In truth, I do not believe that, today at least, there is an absolute taboo against such contracts at all; in the words of the Restatement [of Contracts § 558, they are invalid only when unreasonable. * * * What remains of the doctrine is apparently no more than a general hostility, which

---

ance Company filed the agreement, but when sued, attempted to remove the case to federal court. The Wisconsin courts refused to allow removal. The United States Supreme Court reversed on the ground that a state had no constitutional power to compel a surrender of the right of removal to federal court. The observation that even without the statute such an agreement was void appears to be surplusage. The more compelling argument against enforcing the clause was the fact that an unconstitutional condition was being imposed. Since the alternative was prohibition against doing business in Wisconsin, the contract could also be characterized as one of adhesion. We do not face the *Morse* constitutional argument in this case.

11. *See, e.g.,* Austrian Lloyd Steamship Co. v. Gresham Life Ass. Soc'y [1903] 1 K.B. 249 (C.A.,) ; Kirchner & Co. v. Gruban, [1909] 1 Ch. 413 (1908) ; The Media, 41 Lloyd's List L.R. 80 (Adm.Div. 1931).

For a discussion of the law on forum clauses in the British Commonwealth see Cowen and Mendes da Costa, The Contractual Forum: A Comparative Study, 43 Can.Bar Rev. 453 (1965). For other countries, *see generally* The Validity of Forum Selecting Clauses: Proceedings of the 1964 Annual Meeting of the American Foreign Law Association, 13 Am.J.Comp. L. 157 (1964) ; Lenhoff, The Parties' Choice of a Forum: "Prorogation Agreements", 15 Rutgers L.Rev. 414 (1961).

12. Many of the cases are cited at Annot., 56 A.L.R.2d 300 (1957) (and Later Case Service, 1967). In 1950 it was said of the few cases that enforced a forum clause, "they stand alone, separate and apart, branded with the malodorous antipathy of a bastard child at a family reunion of bluebloods". Comment, Agreements in Advance Conferring Exclusive Jurisdiction on Foreign Courts, 10 La.L.Rev. 293, 297 (1950).

can be overcome, but which nevertheless does persist.

Krenger v. Pennsylvania Railroad, 2 Cir. 1949, 174 F.2d 556, 561 (concurring opinion). In 1951, the Second Circuit enforced a forum clause specifying Norwegian courts. Cerro De Pasco Copper Corporation v. Knut Knutsen, 2 Cir. 1951, 187 F.2d 990.[13] And in 1955 it went one step farther in destroying the hostility, holding in Wm. H. Muller & Company v. Swedish American Lines Ltd., 2 Cir. 1955, 224 F.2d 806, cert. denied, 1955, 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793, that courts should enforce a forum clause in an international contract unless it was unreasonable or prohibited by statute.[14] I must disagree

with the majority's conclusion that Indussa Corporation v. S.S. Ranborg, 2 Cir. 1967, 377 F.2d 200,[15] overrules this part of Muller. Indussa's decision not to enforce a forum clause derived from its view that the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315, where applicable, prohibited such clauses. COGSA did apply to Muller (as it did to Carbon Black) and for that reason Muller was overruled. "[T]he Muller court leaned too heavily on general principles of contract law and gave insufficient effect to the enactments of Congress governing bills of lading. * * *" 377 F.2d at 202. Where COGSA does not apply as in this case, I believe Muller's "general principles of contract law" still lead to Muller's result.[16]

13. Although Cerro De Pasco was a New York corporation, the district court found that it was "like an assignee" of a Belgian corporation and that the controversy was therefore really between aliens. S.D.N.Y. 1950, 94 F.Supp. 60, 61. The Second Circuit, however, did not refer to this argument. It dealt specifically with the issue whether an American court could decline jurisdiction of an American plaintiff and held that the forum clause made Swift & Co. Packers v. Compania Colombiana, 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (see discussion in section III, infra), inapposite.

14. In Muller a New York corporation sued in a New York federal court to recover the value of a cargo of cocoa beans lost in transit between Sweden and Philadelphia. The district court dismissed the suit because a clause in the bill of lading provided that any claims against the vessel's owner, a Swedish corporation, should be decided according to Swedish law and in the Swedish courts. The Second Circuit affirmed, holding first that the forum clause was not contrary to COGSA because its application would not result in a "lessening" of the "liability" imposed upon the defendant by the Act; second, that a forum clause should be enforced unless unreasonable or contrary to statute. The clause in question was not unreasonable because "most of the evidence as to unseaworthiness will be more readily available in a Swedish court"; all members of the crew resided in Sweden and the vessel had been built in that country; and, "for aught that appears", the parties' consent

to inclusion of the clause in the bill of lading was "freely given".

15. In Indussa a New York corporation sued the vessel because a cargo of nails and barbed wire arrived in San Francisco, from Antwerp, Belgium, rusted and depreciated in value. The district court dismissed the suit on the basis of a clause specifying the carrier's principal place of business (Norway) as the forum.

16. Judge Friendly's remarks about the consequences of sending an American to a foreign forum must be read in the context of his concern accurately to comply with a statute prohibiting contract terms that lessen liability. If they go beyond that, I must agree with Judge Moore's special concurrence that it is "singularly inappropriate for our courts to say, in effect, that the courts of all other nations are so unable to dispense justice that as a matter of public policy, we must protect our citizens by outlawing any other tribunal than our own". 377 F.2d at 205. That they do not I am convinced by Judge Friendly's rejoinder: "we do not 'outlaw any other tribunal than our own' as our brother Moore suggests; we hold merely that Congress outlawed clauses prohibiting American courts from deciding causes otherwise properly before them". Id. at 204. I observe, however, that the concern that expenses in going to a foreign court may outweigh an American's modest claim tends to ignore the other side of the coin, that a foreign national's expenses in coming to the United States may outweigh the value of asserting a legitimate defense to the modest claim. It will not do to say in

In 1965, the Pennsylvania Supreme Court enforced a forum clause between two American parties specifying New York courts. The Pennsylvania court started with the proposition that private bargaining could not change statutory rules of jurisdiction or venue.

> However, we do not agree with these cases to the extent that they hold that an agreement between the parties, purporting to determine the forum where future disputes between them should be litigated, is *per se* invalid and without legal effect. The modern and correct rule is that, while private parties may not by contract prevent a court from asserting its jurisdiction or change the rules of venue, nevertheless, a court in which venue is proper and which has jurisdiction should decline to proceed with the cause when the parties have freely agreed that litigation shall be conducted in another forum and where such agreement is not unreasonable at the time of litigation.

Central Contracting Company v. C. E. Youngdahl & Company, 1965, 418 Pa. 122, 209 A.2d 810, 816.

The Third Circuit, confronted with the same forum clause the next year, concluded that

> both federal and state courts have increasingly in recent years recognized

the same principle which the Supreme Court of Pennsylvania has now adopted. It is becoming more widely recognized that for reasons of business or convenience the parties may have bargained that all litigation arising out of their complex activity under a contract shall be drawn into one jurisdiction. So long as there is nothing unreasonable in such a provision there is no basis for viewing it as an affront to the judicial power, which must be stricken down. On the contrary, it should be respected as the responsible expression of the intention of the parties so long as there is no proof that its provisions will put one of the parties to an unreasonable disadvantage and thereby subvert the interests of justice.

Central Contracting Company v. Maryland Casualty Company, 3 Cir. 1966, 367 F.2d 341, 344–345.[17]

This very cursory review indicates that an unqualified judicial opposition to forum and arbitration clauses has at best only weak historical antecedents. Neither arbitration nor forum clauses were the subject of such opprobrium as has popularly been supposed. Concern there was, but not a universal rule that such clauses were void. And despite American courts' general disregard of forum clauses, significant dissenting views have been registered.[18]

---

these cases that part of the contract has American ties, for part of the contract has foreign ties. Properly designed forum clauses can deal with such circumstances and arrive at a fair compromise.

17. The Supreme Court may have expressed approval of forum clauses in an interstate context in National Equipment Rental, Limited v. Szukhent, 1964, 375 U.S. 311, 315–316, 84 S.Ct. 411, 11 L.Ed.2d 354, 357–358. In dealing with a contract clause designating an agent for service of process, the Court said:

> The purpose underlying the contractual provision here at issue seems clear. The clause was inserted by the petitioner and agreed to by the respondents in order to assure that any litigation under the lease should be conducted in the State of New York. * * * And it is settled * * * that parties to a con-

tract may agree in advance to submit to the jurisdiction of a given court. * * *

*Szukhent* is not significant authority, however, because the Court there was faced with the question whether New York courts had jurisdiction, not whether other courts should decline jurisdiction. Justice Black, dissenting, reads *Szukhent* more broadly: "Here this contract as effectively ousts the Michigan courts of jurisdiction as if it had said so. Today's holding disregards Michigan's interest in supervising the protection of rights of its citizens who never leave the State but are sued by foreign companies with which they have done business". 375 U.S. at 327, 84 S.Ct. at 420, 11 L.Ed.2d at 364–365.

18. Earlier cases foreshadowed these results. Gilbert v. Burnstine, 1931, 255 N.Y. 348,

## II.

A search for policies to buttress the wholesale invalidation of forum clauses is likewise unsuccessful. Chief Justice Shaw of Massachusetts tried to formulate the arguments in 1856, recognizing then that history afforded "no authority upon which to determine the case". Nute v. Hamilton Mutual Insurance Company, 72 Mass. (6 Gray) 174, 185 (1856). He reasoned first that

> [t]he rules to determine in what courts and counties actions may be brought are fixed, upon considerations of general convenience and expediency, by general law; to allow them to be changed by the agreement of parties would disturb the symmetry of the law, and interfere with such convenience.

*Id.* at 184. This symmetry and convenience argument bears doubtful relevance to the intrastate venue problems involved in Nute.[19] On the international scene, it is simply inapplicable. Reese at 188. No general law fixes venue among the nations and states, only individual jurisdiction rules and happenstance. Convenience and expedience can more successfully be served by duly considered forum agreements fairly bargained for and enforceable.

Shaw's second concern was that forum contracts might be induced by considerations tending to bring the administration of justice into disrepute; such as the greater or less intelligence and impartiality of judges, the greater or less integrity and capacity of juries, the influence,

more or less, arising from the personal, social or political standing of parties in one or another county.

*Id.* at 184. To the extent this argument is a real concern, it appears less pertinent to an international context than to intrastate venue problems where parties might more easily exert influence on local adjudicators. If it is a problem, however, wholesale prohibition of forum clauses is an excessive response. An inquiry that takes this factor into account where it arises would adequately meet that concern. The best comment about Shaw's policy arguments is his own: "these considerations are not of much weight" and "no great reliance" deserves to be placed upon them. *Id.* at 184.

The greatest inconvenience to the Massachusetts Chief Justice's mind was

> requiring courts and juries to apply different rules of law to different cases, in the conduct of suits, in matters relating merely to the remedy, according to the stipulation of parties in framing and diversifying their contracts in regard to remedies.

*Id.* Of course consistent enforcement of a forum stipulation need not produce confusion. Shaw's real objection was rooted in his belief that the parties to a contract could not make terms with regard to their remedy; that was a matter only the courts could decide. Id. at 180–181. Although the distinction between substantive rights and remedies may well exist, the breadth of the principle as Shaw saw it has been subjected to serious challenge, Ehrenzweig

174 N.E. 706, hold that a New York citizen's agreement to arbitrate in England should be enforced. The New York court concluded that these agreements were not contrary to public policy, and "[c]ontracts made by mature men who are not wards of the court should, in the absence of potent objection, be enforced. 174 N.E. at 707. Mittenthal v. Mascagni, 1903, 183 Mass. 19, 66 N.E. 425, enforced a forum clause designating Italian courts. Although the plaintiffs were New York citizens, the contract conferred Italian dom-

icile upon them. Therefore, the court spoke of the contract as "between citizens of foreign states" and found no public policy to prevent enforcing it. For a collection of recent cases enforcing forum clauses see Annot., *supra* note 12.

19. See Daley v. People's Bldg., Loan & Sav. Ass'n., 1901, 178 Mass. 13, 59 N.E. 452 (Holmes, C. J.: *Nute* obviously was "a somewhat hesitating decision", not to be extended; *held*, contractual stipulation of New York forum was enforceable).

§ 41, at 149,[20] and in the case of arbitration statutes, overruled.

> [G]enerally, all stipulations made by parties for the government of their conduct, or the control of their rights, in the trial of a cause, or the conduct of a litigation, are enforced by the courts.
>
> * * * [I]t is not true that parties cannot enter into stipulations which in some sense will bind and control the action of the courts. They do not literally control the power of the courts except as such power is in all cases circumscribed by the necessity which obliges every court to apply the proper rules of law to the facts of every case, and to exercise its powers according to established principles.

In re New York, Lackawanna & Western Railroad Company, 1885, 98 N.Y. 447, 453. It may be that some questions of remedy are less amenable to private settlement than are questions of primary rights and obligations. But the specific question still unanswered is whether forum clauses are thus an inappropriate subject for private ordering.

This Court was no more successful in marshalling arguments to support its conclusion in *Carbon Black*. We simply relied on authority as characterized by Corpus Juris Secundum and American Jurisprudence to opine that forum agreements are "contrary to public policy". That of course "is the conclusion to be proved rather than proof for the conclusion". Ehrenzweig, § 41, at 149. Our apparent concern that such agreements attempted to "oust" us of jurisdiction was ill-considered. The majority here correctly points out that jurisdiction is not an issue. The question is whether a court possessing jurisdiction should for good and sufficient reasons decline to exercise it. But since the bogey of jurisdictional ouster infuses so much of the opposition to forum clauses and since it infuses the *Carbon Black* rule to which the Court pays

obeisance today, it is necessary to lay it to rest. There are various ways to do so. For example, "[i]f the agreement is enforced, it cannot truly be said that jurisdiction has been conferred or ousted by the parties. Jurisdiction is exercised or withheld only by force of the law that gives effect to the parties' agreement". Perillo, Selection Forum Agreements in Western Europe, 13 Am. J.Comp.L. 162 (1964); *accord*, In re New York, Lackawanna & Western Railroad Company, 1885, 98 N.Y. 449, 453. If that formulation does not persuade the fearful we can follow the example of the Netherlands. There "the courts recognize that the parties have no power to modify the rules of jurisdiction. Nevertheless, the courts refuse to participate in a breach of contract. Consequently, they refuse to take cognizance of a case in violation of the parties' agreement". Perillo at 165; *accord*, Racecourse Betting Control Board v. Secretary for Air, [1944] 1 Ch. 114, 126 (C.A.1943).

In summarizing the English view, Lord Denning couches it in these terms:

> I do say that the English courts are in charge of their own proceedings: and one of the rules they apply is that a stipulation that all disputes should be judged by the tribunals of a particular country is not absolutely binding. It is a matter to which they will normally give effect, but it is subject to the overriding principle that no one by his private stipulation can oust these courts of their jurisdiction in a matter that properly belongs to them.

The Fehmarn, [1958] 1 Weekly L.R. 159, 161–62 (C.A.1957). Finally a federal judge has concluded:

> With th[e] proposition [that the parties cannot oust a court of jurisdiction] there can be no quarrel. However, the very fact that it is so well established tends to reduce its value, since parties to an exclusive forum arrangement are unlikely to intend a purpose which they must realize can-

---

**20.** See 6A Corbin § 1432, at 386 n. 76 & § 1434, at 397.

not be achieved. Therefore, in drafting their agreement they would normally mean not to deprive some courts of jurisdiction but to express their desire that these courts relinquish jurisdiction in deference to what was at least originally the belief that suits could be better or more conveniently tried someplace else.

Geiger v. Keilani, E.D.Mich.1967, 270 F.Supp. 761, 765 (Freeman, C. J.) [21]

I cannot believe that jurisdictional ouster is a real issue. We are willing to dismiss a suit of which we have jurisdiction if it is between aliens.[22] And federal courts have not been chary of "losing jurisdiction" in other areas. In habeas corpus cases from state courts, federal courts decline to exercise jurisdiction until a prisoner has exhausted state remedies. The exhaustion doctrine, now codified, 28 U.S.C. § 2254 (b), was characterized not as a jurisdictional bar, but as an argument of comity—to decline, in favor of state courts, jurisdiction that we possessed. Fay v. Noia, 1963, 372 U.S. 391, 418, 83 S.Ct. 822, 9 L.Ed.2d 837, 856–857. The absention doctrine is similar. "Abstention allows a federal court whose *jurisdiction has been properly invoked* to postpone decision, pending trial in a state court, when the result might turn on issues of state law." Note, Federal —Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 604 (1967) (emphasis supplied).[23] The doctrine of forum non conveniens has also allowed a court with jurisdiction of a suit to refuse to hear the controversy where a more convenient forum is available. Gulf Oil Corporation v. Gilbert, 1947, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055. If in all these cases we can recognize that other policies militate against the formal notion that once we have jurisdiction we must exercise it, surely we can undertake the task which *Carbon Black* neglected, of weighing the arguments against forum clauses. It is time to lose our fixation with the ancient notion of physical power—that because a tort occurs within this Court's "mare nostrum" we would be derelict not to decide the case.[24]

III.

What does emerge from the history, the cases, and the commentary is a legitimate concern for the bargaining conditions in which the forum agreement was made and the quality of the remedy available to the parties if the agreement is enforced. These two concerns encompass several relevant factors that have been isolated. (1) Did the parties freely and intelligently enter their agreement? In contracts of adhesion, where one party possessed overweening bargaining power or where there was no opportunity to negotiate the terms, and of course where fraud has occurred, courts are unwilling to deny a plaintiff his forum on the basis of the

21. Compare Judge Frank's statement in *Knut Knutsen:* "It might be said that the court took jurisdiction and granted specific performance. * * * 187 F.2d at 991 n. 1.

22. *See Anastasiadis, supra* note 3; Burt v. Isthmus Dev't Co., 5 Cir.1955, 218 F.2d 353, 356, cert. denied, 1955, 349 U.S. 922, 75 S.Ct. 661, 99 L.Ed. 1254.

23. *See* Reetz v. Bozanich, 1970, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68.

24. Other attempts to justify the broad rule against forum clauses have been no more successful. Attempts to distinguish arbitration by observing that arbitration "was not a limitation on the forum, but rather was an agreement to eliminate the need for any forum whatever", Bergman, Contractual Restrictions on the Forum, 48 Calif.L.Rec. 438, 439 (1960), are simply not convincing. The argument that a party's choice of forum is a substantial right not to be bartered away, *id.* at 328–329; *Morse, supra,* 22 L.Ed. at 368, is conclusory like the *Carbon Black* statement that forum clauses are against public policy. Neither position gives reasons why it should be accepted.

contractual stipulation.[25]  (2) Would the stipulated forum in rendering its decision transgress an important public policy of the present forum?  In cases of bankruptcy, divorce, successions, real rights, and regulation of public authorities, for example, courts cannot remit the dispute to a foreign forum lest a foreign court render a decree conflicting with our ordering of these affairs.[26] And in cases where objectionable activity within our jurisdiction would be encouraged by the foreign court's decree, we would reach a similar result. *Cf.* The Kensington, 1902, 183 U.S. 263, 22 S.Ct. 102, 46 L.Ed. 190.  (3) Will the designated forum adjudicate the parties' dispute?  A court may postpone declining jurisdiction until it is sure the foreign court will hear the dispute and provide a remedy.  *See, e. g.,* Swift & Company Packers v. Compania Colombiana, 1950, 339 U.S. 684, 697– 698, 70 S.Ct. 861, 94 L.Ed. 1206, 1215. (4) Is the designated forum seriously inconvenient for the trial of the action? Since we recognize in the doctrine of forum non conveniens that a jurisdictionally selected forum should sometimes give way to another in the face of strong arguments of convenience, it would be anomalous to ignore those considerations where the parties have selected a forum without the benefit of hindsight.

This list is not exhaustive but is exemplary of relevant considerations. But since these concerns can be isolated and since forum clauses can provide such a clear benefit of certainty in international trade, we should be satisfied to apply these concerns to individual cases rather than reject all forum agreements.  The burden of proof should be on the party objecting to the designated forum to support his objections.  *Maryland Casualty,* 367 F.2d at 345; *Youngdahl,* 209 A.2d at 816.  The fourth factor in particular must not become just another label for the doctrine of forum non conveniens.  It is essential to remember that the parties expressed in their agreement the judgment that on balance a particular forum was most convenient for trial of their disputes.[27]  The burden should rest upon the party objecting to that forum to show a significant balance of greater inconvenience in litigating in the designated forum.

The majority has intimated that the forum clause at issue here would fail to qualify even under this more charitable approach, and holds that the factors in this case justify the district court's discretionary refusal to disturb the plaintiff's choice of forum.  If the test I advocate is the correct one, however, there was no proper exercise of discretion by the district court.  That court's memorandum order demonstrates that it invalidated the forum clause under *Carbon Black* and then, ignoring the forum clause, declined to dismiss on a forum non conveniens theory.[28]  The district court's conclusion, apart from

**25.**  This may be a better rationale for cases that refuse to enforce forum clauses in passenger and baggage tickets. *See, e.g.,* Muoio v. Italian Line, E.D.Pa.1964, 228 F.Supp. 290; Note, Validity of Contractual Stipulation Giving Exclusive Jurisdiction to the Courts of One State, 45 Yale L.J. 1150 (1936).

**26.**  *See* Article 3, Draft of a Convention on the General Jurisdiction of Contractual Forums Adopted by the Ad Hoc Committee, December 20, 1963, The Hague Conference on Private International Law, 13 Am.J.Comp.L. 160 (1964).

**27.**  *Youngdahl, supra* note 45, at 816:

"Mere inconvenience or additional expense is not the test of unreasonableness since it may be assumed that the plaintiff received under the contract consideration for these things."

**28.**  The district court cited *Muller,* but its analysis clearly placed the burden on the defendant to justify the transfer, as is proper under a forum non conveniens approach.  The court relied on Mobil Tankers Co. v. Mene Grande Oil Co., 3 Cir. 1966, 363 F.2d 611, cert. denied 1966, 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225, for its criteria, that "[u]nless 'the balance is strongly in favor of the [Respondent], [the libellant's] choice of forum should rarely be disturbed.'"

the authority of *Carbon Black*, was that "[t]he balance of conveniences here is not strongly in favor of Defendant and Plaintiff's choice of Forum should not be disturbed". A proper approach to a forum clause should reverse that burden. It is a truism that we do not observe an exercise of discretion that was misled by an erroneous view of the law. And to dispel any notion that this forum clause was unreasonable as a matter of law, I canvass the factors I have suggested.

(1) Zapata has neither presented evidence of nor alleged fraud or undue bargaining power in the agreement. Unterweser was only one of several companies bidding on the project. No evidence contradicts its Managing Director's affidavit that it specified English courts "in an effort to meet Zapata Off-Shore Company half way". Zapata's Vice President has declared by affidavit that no specific negotiations concerning the forum clause took place. But this was not simply a form contract with boilerplate language that Zapata had no power to alter. The towing of an oil rig across the Atlantic was a new business. Zapata did make alterations to the contract submitted by Unterweser. The forum clause could hardly be ignored. It is the final sentence of the agreement, immediately preceding the date and the parties' signatures. Perhaps more evidence could be accumulated, but under this evidence Zapata has not met the burden of showing that it was pressured into the forum stipulation.

(2) I conclude that the English courts would provide an adequate remedy and would contravene no important American public policy. In dealing with forum non conveniens, the majority intimates that the district court's discretion to decline jurisdiction was limited because Zapata is an American citizen and the English courts would violate our public policy. The towage contract provided:

1. \* \* \*

> Urag [Unterweser], their masters and crews are not responsible for defaults and/or errors in the navigation of the tow.

2. \* \* \*

> b) Damages suffered by the towed object are in any case for account of its Owners.

On the premise that the English courts would apply English law rather than American in this situation and upon the affidavit of Zapata's English law expert that English courts will enforce the contract, the majority concludes that our policy against enforcing exculpatory clauses might be violated if the controversy proceeded to England.

Of course if Zapata had chosen to abide by the contractual stipulation of forum the case would have proceeded in England and we would have had no opportunity to enforce this public policy. But beyond that, we should be careful not to over-emphasize the strength of the policy. According to Bisso v. Inland Waterways Corporation, 1955, 349 U.S. 85, 91, 75 S.Ct. 629, 99 L.Ed. 911, 918,[29] two concerns underlie the rejection of exculpatory agreements: that they may be produced by overweening bargaining power; and that they do not sufficiently discourage negligence. Bisso applied these concerns to towage contracts in admiralty jurisdiction. Yet when we sit in diversity we will enforce an exculpatory clause in favor of a railroad. Seaboard Coast Line Railroad Company v. Tennessee Corporation, 5 Cir. 1970, 421 F.2d 970. Neither there nor in the case of insurance contracts do the dangers strike us as so

---

**29.** Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 1963, 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78, reversed per curiam our enforcement of a towage clause assigning all liability to a barge owner solely on the authority of two earlier companion cases, *Bisso*, and Boston Metals Co. v. S/S "Winding Gulf", 1955, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933. Since *Winding Gulf* was also decided on the authority of *Bisso*, *Bisso* appears to be the determining authority.

serious that federal courts cannot enforce the state law. The question here is whether the fact that a towage contract is involved and the fact that we are sitting in admiralty require us to outlaw a forum that might enforce exculpatory clauses. I believe the policy is not so strong. *Bisso* depends less on the questions of public policy involved than on the long line of authority which it believed established a federal rule barring enforcement of such contracts.[30] Although the question has been settled by the Supreme Court for federal courts, we would unduly extend its scope in refusing to enforce a forum clause simply because a foreign forum may enforce an exculpatory clause. Here the conduct in question is that of a foreign party occurring in international waters outside our jurisdiction. The evidence disputes any notion of overreaching in the contractual agreement. And for all we know, the uncertainties and dangers in the new field of transoceanic towage of oil rigs were so great that the tower was unwilling to take financial responsibility for the risks, and the parties thus allocated responsibility for the voyage to the tow.[31] It is equally possible that the contract price took this factor into account. I conclude that we should not invalidate the forum selection clause here unless we are firmly convinced that we would thereby significantly encourage negligent conduct within the boundaries of the United States.[32] At the very least, before ex-

30. *Bisso* was only a four-Justice opinion. The fifth, Justice Douglas, concurred only because he professed ignorance of the "economics and organization of this business". He admitted that the Court's rule might be "outmoded" and in need of change, that the tugboat industry might be "less able to carry the risks of * * * losses than its customers, and that it might be "fairer in the long run" to allow the tugboat operator to transfer liability. But in the absence of a record that threw light on those "large questions of policy", he was unwilling to change what he considered an already established rule in the federal courts. Justice Frankfurter, joined by Justices Reed and Burton, wrote a telling dissent seriously questioning the Court's use of its authorities and reaching the conclusion that the courts should not intervene to upset the arrangements of private parties where there was no evidence of inequality of bargaining power or of concentrated ownership or of unavailability of services by other tugs who would not require exculpatory clauses. In Frankfurter's words, the argument that irresponsibility would be stimulated "has little force, unless we are prepared also to forbid the tug to insure against such losses or liabilities". 349 U.S. at 119, 75 S.Ct. at 647, 99 L.Ed. at 932.

31. Compare our argument in Seaboard Coast Line R.R. v. Tennessee Corp., 5 Cir.1970, 421 F.2d 970, 974: An exculpatory clause "merely means that if such an injury occurs the parties need not undertake to go to battle to determine whose negligent act, if in fact there was negligence at all, produced the injury. * * *

In effect, it seems to us, that in light of the relation of the parties here, the railroad company was simply not willing to permit conjunctive use of railroad equipment by an industrial concern which may well be presumed not to have the same skill in operation of railroad equipment as the railroad company itself without requiring of the industry that it assume absolute liability with respect to any injuries resulting therefrom".

32. It is true that The Kensington, 1902, 183 U.S. 263, 22 S.Ct. 102, 46 L.Ed. 190, holds that federal courts are not to enforce a foreign law against our public policy where part of a contract is executed in the United States. But in *The Kensington* the defendant was a New Jersey corporation and thus a logical object of regulation by American courts. Here we deal with a foreign national operating at the time of the mishap outside our jurisdiction. In this context, I believe it is not a semantic argument to contend that enforcement of a forum clause is sufficiently attenuated from enforcement of substantive law contrary to our public policy that we do not run afoul of *The Kensington*.

Lest it be thought I thus throw open a route for United States towage contracts to escape the rule of *Dixilyn*, I observe that where both parties are American, and the tow is performed here, it is difficult to see how the towee could fail to prove a foreign forum clause unreasonable. Whether a foreign tower who suffered a mishap while operating within our jurisdiction could take advantage of a forum clause remitting him to a more favorable forum I need not now decide.

cluding the forum clause, we should remand to the district court for compilation of a record dealing with the economic relationships in this industry and the consequences of enforcing forum clauses in this international context.

Zapata's American citizenship may very well be an argument in some cases for refusing to decline jurisdiction on the basis of forum non conveniens.[33] Swift & Company Packers v. Compania Colombiana, 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206, decided on forum non conveniens principles (no forum clause was mentioned) that it would not deny an American citizen his American forum primarily because there was no assurance that the defendant would appear with adequate security in the foreign court. Here, of course, Unterweser and Zapata have already joined argument in the English courts, the English courts have ruled that they have jurisdiction, and Unterweser has offered to post the same security that is available to Zapata here. The Supreme Court in Swift, moreover, expressly declined to decide the "abstract question whether United States admiralty courts may decline jurisdiction over libels brought by United States citizens". 339 U.S. at 697, 70 S.Ct. at 869, 94 L.Ed. at 1215. In this case we deal with a situation where Zapata voluntarily and specifically surrendered in the contract its right to proceed in American

courts. *See* Cerro De Pasco Copper Corp. v. Knut Knutsen, 2 Cir. 1951, 187 F.2d 990, 991 (*Swift* "inapposite" in context of a forum clause). A proper solicitation for the interests of American citizens may militate in favor of enforcing these clauses. Otherwise, Americans who wish to contract with foreign nationals and who are willing to accept a forum clause will have difficulty in convincing the foreign party that he can rely on the agreement.[34]

(3) The availability of the English forum is certain. Soon after Zapata brought its action in the district court, Unterweser moved that court to decline jurisdiction and initiated proceedings for breach of contract and moneys due in the High Court of Justice, London, England, as the forum provision directs. Zapata appeared in the London court and moved to dismiss the summons on three grounds: that the English court was not a convenient forum; that proceedings between the parties were underway in the United States; and that the writ had been improperly served. The High Court of Justice ruled that it had jurisdiction, that the summons had been properly served, and that the action should proceed. Zapata appealed. The English Court of Appeal affirmed, holding that the forum provision was reasonable and that Zapata had made no showing which would compel the Court to refuse to enforce the agreement.[35] Thus, the English courts have ruled

---

33. *See* Annot., 48 A.L.R.2d 800 (1956) (and Later Case Service).

34. Burt v. Isthmus Dev. Co., 5 Cir. 1955, 218 F.2d 353, cert. denied, 1955. 349 U.S. 922, 75 S.Ct. 661, cited by the majority at fn. 37, can be distinguished on several grounds. First, although the factual statement mentions that under the contract the parties submitted to Mexican jurisdiction and waived the jurisdiction of other courts, that element played no part in the decision because the Court found that the basic issue of dispute was whether "negotiations ever matured into a contract". *Id.* at 358. Second, *Burt*, a diversity case, specifically recognized that "[i]n admiralty, courts have often refused to entertain actions

* * * between citizens and aliens where foreign law would govern the issue, and have relegated the litigants to the foreign court". *Id.* at 356. Finally, *Burt* followed *Swift's* example and expressly declined to hold that an American citizen's suit could not be dismissed even in nonadmiralty cases. If *Burt* requires "positive evidence of unusually extreme circumstances" and a conviction "that material injustice is manifest", *Id.* at 357, before enforcing a forum clause, it is subject to the same criticisms as *Carbon Black*.

35. Lord Justice Willmer said:
    * * * * *
    The law on the subject, I think, is not open to doubt, and I do not think

that they will hear the controversy. Furthermore, when Unterweser advised the district court that it had initiated the action in England, it offered to keep available all the security given in the initial action—$3,500,000—to satisfy any relief Zapata might obtain in London.

(4) The majority concludes that factors of convenience do not justify dismissing the action. But the majority treats the question under the doctrine of forum non conveniens the standard for which is that the plaintiff's choice of forum "should rarely be disturbed" unless "the balance is strongly in favor" of the defendant. Gulf Oil Corporation v. Gilbert, 1947, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055. I submit that when a forum clause is involved our standard

should be not to disturb the *contractual* choice of forum unless "the forum chosen by the parties would be a seriously inconvenient one for the trial of the particular action". Restatement (Second) of Conflict of Laws § 80, Comment, *supra* note 5. From this perspective I conclude that factors of convenience do not justify refusing the motion to decline jurisdiction.

The majority considers the following factors relevant: the casualty occurred close to the Fifth Circuit and the district court; a "considerable number" of witnesses live on the Gulf Coast; preparations for the voyage, inspection of the damage and repair work were performed here; depositions of the Bremen's crewmen are available; and there are no contacts with the English forum.

that it is really necessary to cite the authorities to which we have been referred. It is always open to parties to stipulate (as they did in this case) that a particular court shall have jurisdiction over any dispute arising out of their contract. Here the parties chose to stipulate that disputes were to be referred to the "London" court, which I take as meaning the High Court in this country. *Prima facie* it is the policy of the court to hold parties to the bargain into which they have entered. *Prima facie* it is to be presumed, therefore, that the plaintiffs should have leave to prosecute their proceedings in this country, and in pursuance of that to serve their writ out of the jurisdiction. But that is not an inflexible rule, as was shown, for instance, by the case of *THE FEHMARN*, in which I was myself concerned, and which came to this court. That was a case in which the court in its discretion declined to give effect to a stipulation made by the parties in their contract conferring jurisdiction on a foreign court.

I approach the matter, therefore, in this way, that the court has a discretion, but it is a discretion which, in the ordinary way and in the absence of strong reason to the contrary, will be exercised in favour of holding parties to their bargain. The question is whether sufficient circumstances have been shown to exist in this case to make it desirable, on the grounds of balance of convenience, that proceedings should not take place in this coun-

try, the stipulated forum, but that the parties should be left to fight their battles in the United States of America.

\*      \*      \*      \*      \*

I am unable to see that the judge acted on any wrong principle \* \* \* nor am I prepared to say that the judge's exercise of his discretion is shown to have been plainly wrong.

Lord Justice Diplock added:

\*      \*      \*      \*      \*

I say again in this case, as I said in *Mackender*: "Where parties have agreed to submit all their disputes under a contract to the exclusive jurisdiction of a foreign court, I myself should require very strong reason to induce me to permit one of them to go back on his word". We should, I think, apply the same principle whether the forum of contractual choice is England or of some other country.

Lord Justice Widgery concluded:

\* \* \* The parties here have quite deliberately chosen that their disputes shall be decided in the courts of this country, and it would need strong grounds in my view to deprive either party who sought to take advantage of that course from receiving the advantage which he expects from it. I also would put my decision on the footing that there is no reason here to suppose that the learned judge exercised his discretion improperly. But, like my Lord, I feel that had I had to decide the matter myself, I should have reached precisely the same conclusion,

Thus, they agree with the district court, which concluded that a "great majority, if not all, of the witnesses are or were in the United States, including an alleged forty potential witnesses residing permanently here." But this observation appears to ignore the fact that most of Unterweser's witnesses reside in Germany—the twenty-three crew members of the Bremen, Von Aswegen, Managing Director of Unterweser, personnel from the builders of the Bremen and the independent contractors who outfitted the vessel, individuals with companies for whom Bremen has previously towed. It is true that depositions of the German crew members are available because Zapata obtained them immediately after filing its libel. But if, as is likely, Zapata's witnesses are its crewmen (on the Chaparral) and Unterweser's witnesses are its crewmen (on the Bremen), the inference from that observation is that Zapata should have live witnesses at trial while Unterweser relies on depositions. Presumably depositions of the American witnesses could be taken for an English trial, or both sides could face the same difficulty of transporting their witnesses. Although the voyage began here and the casualty occurred nearby, the tug was built in Germany and had its home port in Bremen. As the High Court of Justice observed, "There is probably a balance of numbers in favor of the Americans, but not, as I am inclined to think, a very heavy balance". The fact that no contacts exist with the English forum is not determinative. That forum was chosen as a logical compromise should a dispute arise.[36] The English court has the advantage of dividing the inconveniences between the disputants. An English-speaking court with common law traditions is probably more amenable to American plaintiffs than the German courts with which there are "contacts". Finally, the English court may very well have been chosen for the law it would apply. That factor may have enabled Zapata to obtain the low bid from Unterweser. I conclude, therefore, that Zapata has not justified disturbing the contractual choice of forum.

\* \* \*

For all these reasons, I believe we should overrule *Carbon Black* and remand this case to give the district court an opportunity to find the relevant facts and exercise its discretion in light of the "modern and correct rule".[37] If the district court should properly have declined

36. *Cf.* Mittenthal v. Mascagni, 1903, 183 Mass. 19, 66 N.E. 425, 426–427:

We can fancy the parties to this contract at the time of making it saying something like this: "As the performance of this contract will not only involve travel through one or more foreign countries in getting to America and returning, but will involve journeying long distances through a great many independent states, each of which has its own courts and system of laws, under some of which a person sued in a civil action, when about to leave the state, may be arrested and held to bail or in imprisonment, if suits may be brought in any one of these numerous jurisdictions there is a liability to great trouble and expense on the part of the defendant in meeting the litigation. The contract contemplates a service of fifteen weeks, after which Maestro Mascagni intends to return to his permanent home, in Florence. It will be better and more reasonable for both of us to provide that our controversies, if any arise, shall be settled by the courts of Florence, than to leave both parties subject to suits in forty or fifty different jurisdictions, at great distances from the home of either." If, moved by such considerations, the parties made the agreement in question, shall the court say that they were non compotes mentis, and that their agreement was so improvident and unreasonable that it cannot be permitted to stand?

Of course if Zapata is correct, that the contract relieves Unterweser from liability for negligence and the English courts will enforce it, then there will be no inconvenience at all, for Zapata will not try to prove negligence.

37. Unterweser filed a limitation action one week before the time for filing lapsed because the district court had not yet ruled on its motion to dismiss. I do not believe it is thereby estopped from pressing its motion to dismiss.

to exercise its jurisdiction, then of course it should not have enjoined the London action. Given the majority's conclusion that the district court properly retained jurisdiction, however, I do not disagree with its analysis that the injunction was then proper.