**Leslie GEIGER and West South American Overseas Corporation, a New York Corporation, Plaintiffs,**

v.

**Nazem Z. KEILANI, Principal Defendant,**

and

**Bank of the Commonwealth (as successor to Public Bank, a State Banking Corporation), Garnishee Defendant,**

and

**Hussein Z. Keilani, Intervening Defendant.**

**Civ. A. No. 28411.**

United States District Court
E. D. Michigan, S. D.
June 29, 1967.

Lawrence I. Levi, Frank M. Wiseman, Marx, Levi, Thill & Wiseman, Detroit, Mich., for plaintiffs.

Benjamin T. Hoffiz, Jr., Detroit, Mich., for principal defendant.

William H. Merrill, Emery, Parsons, Bahr, Tennent & Hogan, Detroit, Mich., for garnishee defendant.

Joseph W. Louisell, Louisell & Barris, Detroit, Mich., for intervening defendant.

## OPINION

FREEMAN, Chief Judge.

■ Plaintiffs in this breach of contract action are an individual citizen of New York, Leslie Geiger, and his wholly owned company, West South American Overseas Corporation. The defendant Nazem Z. Keilani is alleged to be a citizen of the Republic of Chile and the owner of various mineral rights in that country. He is not subject to personal jurisdiction in this District. Nevertheless, plaintiffs successfully garnished a Detroit bank account of which Keilani and his nephew were joint tenants, thereby enabling the Court to proceed on the basis of quasi-in-rem jurisdiction.[1]

According to the complaint, the agreement in dispute provided in part that the corporate plaintiff was to furnish a 130-ton vessel equipped to accomplish the measuring, prospecting and manifestation of some of the mineral deposits in which defendant had an interest. In return, Keilani was required to take certain steps to assist West South American in carrying out these preliminaries to the actual exploitation which was the parties' ultimate ambition. The company invested $26,500, the amount now sought to be recovered, in chartering, outfitting and provisioning a ship satisfactory for use in the project, as well as for hiring both a crew to man her and a group of geologists to handle the scientific aspects of the program. The defendant, however, allegedly defaulted in his obligations by neglecting, among other things, to properly register the contract in Chile and by refusing to make available to the personnel engaged by the corporation documents and geological reports under his control. Keilani denies that he was bound to do these things.

Two motions, each filed by the defendant, are currently before the court: One is for summary judgment; the other, the topic of this opinion, demands that the suit be dismissed on the ground that it should have been brought in Chile in

---

1. Although in the text the term "defendant" is used in reference to Nazem Z. Keilani only, he is actually the litigant primarily interested in the immediate question among a group of defendants composed of Nazem, Hussein Z. Keilani, his nephew and intervening defendant who claims sole ownership of the bank account, and the bank, the garnishee defendant which maintains that it has a right of setoff against the account because of an outstanding loan made to Hussein.

Apparently plaintiff Geiger joined in this action so that he would be a party of record if it were determined that he rather than his corporation entered into the contract from which the suit arises. He seems to anticipate that there could be a question whether he signed the agreement in his individual capacity or as an agent for the firm.

accordance with the final paragraph of the translation of the Spanish language contract:

> For all legal purposes, the contracting parties establish their provisional residence in the city of Santiago de Chile, Muerfanos street number 979, Room 520. Any difference of opinions which may arise between the parties regarding the interpretation of this [sic] Option-Agreement clauses, shall be resolved by the Chilean Ordinary Courts.

Before applying substantive law to this exclusive forum clause, it is necessary to consider whether by virtue of Federal Rule of Civil Procedure 12(g) Nazem Keilani's effort to invoke the provision comes too late. Rule 12(g) states:

> A party who makes a motion under this rule may join with it any other motions herein provided for and then available to him. If a party makes a motion under this rule [i.e. Rule 12] but omits therefrom any defense or objection then available to him which this rule permits to be raised by motion, he shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h) (2) hereof on any of the grounds there stated.

Rule 12 motions, explicitly said by Rule 12(g)—through its reference to Rule 12(h) (2)—not to be waived by a failure to consolidate, include those related to non-joinder and the merits of a controversy. An additional motion mentioned in Rule 12, viz., that challenging subject matter jurisdiction, can be made at any time. See Rule 12(h) (3). Furthermore, judgment on the pleadings may be sought whenever orderly judicial administration permits. See Rule 12(c). Prior to bringing this motion for dismissal, defendant submitted another having the same objective but founded upon the premise that since neither he nor either plaintiff resides in this District, venue was improper.[2] The threshold issue is whether by not submitting both at the same time he must be denied recourse to the situs-of-suits portion of his agreement.

Rule 12(g) says that a piecemeal approach costs a party the right to press just certain motions unless covered by an exemption—those named in Rule 12—and then, of course, only if he previously brought a motion listed in Rule 12. Apart from the exceptions treated by Rule 12(c) and (h) (2) and (3), Rule 12 deals with attacks addressed to a lack of jurisdiction over the person, insufficiency of process or service, vague or otherwise unacceptable material in pleadings, and incorrect venue. Since the authorities discussed below demonstrate that an agreement purportedly confining litigation to one forum never deprives another tribunal of any jurisdiction which it would otherwise have, Rule 12(g) could be a bar in the present situation only if defendant is once again complaining of venue. While Keilani is certainly saying that this action was commenced in the wrong locality, true venue for federal courts is established by Congress and no one is now maintaining that under the pertinent legislation the matter should not be here. Therefore, his motion must be viewed as similar to a petition under 28 U.S.C. § 1404(a) for transfer to another court although initial venue is proper. Reliance upon this statute is not circumscribed by the waiver principles set out in Rule 12. See Spence v. Norfolk & W. Ry., 89 F.Supp. 823 (N.D.Ohio 1950). Thus, it seems appropriate to hold that defendant is not precluded by Rule 12(g) from urging dismissal for the currently assigned reason.

The relevant substantive law is in a state of transition. Twenty-five years ago the rule seemed fairly well settled

---

**2.** Defendant relied upon 28 U.S.C. § 1391 (a). The court never had an opportunity to rule on the venue question presented by the former motion because Keilani's counsel announced at the beginning of the hearing thereon that he wished to abandon his objection.

that a contract provision, entered into before a conflict arose, by which parties consented to litigate in only one particular place was invariably ineffective if one of them otherwise had the right to sue elsewhere and chose to do so. See 56 A.L.R.2d 300 (1957). In 1955, the Court of Appeals for the Second Circuit handed down what quickly became a landmark decision in Wm. H. Muller & Co. v. Swedish American Line Ltd., 224 F.2d 806. There a New York corporation had filed a libel against a Swedish shipper, demanding compensation for the harm attributable to the loss at sea of a vessel destined from Sweden to Philadelphia and carrying goods of which the libelant was the consignee. The bill of lading noted that all claims against the carrier for injury to freight were to be determined under Swedish law and tried in the courts of that country. After ruling that this part of the shipping document was not rendered inoperative by the Carriage of Goods by Sea Act, the court considered the possibility that it was in conflict with public policy and concluded that an exclusive forum term, regardless when executed, is not per se invalid but should be sustained if in light of the surrounding circumstances it is reasonable. Ample grounds for declining jurisdiction in favor of the Swedish judiciary were found in the showing that most of the potential witnesses resided in Scandinavia and the feeling

that in relation to our traditional notions of justice the courts of Sweden were of high caliber. Similarly, in subsequent contests where a stipulated forum clause was respected, the principal justification often was that the witnesses were nearer the other court. See Pakhuismeesteren, S.A. v. S/S Goettingen, 225 F.Supp. 888 (S.D.N.Y.1963); Takemura & Co. v. The S.S. Tsuneshima Maru, 197 F. Supp. 909 (S.D.N.Y.1961); Aetna Ins. Co. v. The Satrustegui, 171 F.Supp. 33 (D.P.R.1959). On the other hand, enforcement was refused in Chemical Carriers v. L. Smit & Co.'s Internationale Sleepdienst, 154 F.Supp. 886 (S.D.N.Y. 1957), largely because the opponent of the motion to dismiss had demonstrated that the measure of recovery presumed to be binding upon the alternative tribunal would be substantially less than that prevailing in the United States.[3]

■ Plaintiffs cite Carbon Black Export, Inc. v. The S.S. Monrosa, 254 F.2d 297 (5th Cir. 1958), cert. dismissed as improvidently granted, 259 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723 (1959), and emphasize its statement of

> the universally accepted rule that agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced. 254 F.2d 300.[4]

---

**3.** The *Muller* court is not the first to have adopted the reasonableness doctrine. See Mittenthal v. Mascagni, 183 Mass. 19 (1903). The significance of the Second Circuit decision lies in the fact that it applied the rule to cargo damage claims. Litigation of this type is common, and bills of lading regularly contain exclusive forum provisions. Thus, the opinion assumed particular importance and served to arouse an interest in re-evaluating the traditional view toward a contract clause purporting to designate the only place where suit may be brought.

Ironically, *Muller* is no longer authority in many maritime suits. The decision has been overruled insofar as it had held that a stipulated forum agreement could be reconciled with the Carriage of Goods by Sea Act. Indussa Corp. v. S.S. Ran-

borg, 377 F.2d 200 (2d Cir. 1967). However, its rationale is still good and highly persuasive in the present case. Indeed, the court in *Indussa* sought to explain the result in *Muller* on the ground that it had gotten carried away with the "general principles of contract law" appropriate in contests where COGSA is irrelevant.

**4.** The court continued:

> We do not find it necessary to espouse or reject the position taken by the Court of Appeals of the Second Circuit in [*Muller* and additional decisions]. The facts before that Court in those cases were, in each instance, materially different from those before us.

With this proposition there can be no quarrel.[5] However, the very fact that it is so well established tends to reduce its value, since parties to an exclusive forum arrangement are unlikely to intend a purpose which they must realize cannot be achieved. Therefore, in drafting their agreement they would normally mean not to deprive some courts of jurisdiction but to express their desire that these courts relinquish jurisdiction in deference to what was at least originally the belief that suits could be better or more conveniently tried someplace else.[6]

While it would probably be possible to write at length about whether a federal court in a diversity case should apply state law in resolving the question at hand, such a discussion would be of only academic significance in the present context. Compare Central Contracting Co. v. Maryland Cas. Co., 367 F.2d 341 (3d Cir. 1966). Extensive research discloses no Michigan precedent suggesting disapproval of *Muller,* which clearly represents the modern trend as well as the more sound position in an action of this kind.[7] Furthermore, it is apparent that the reasonableness doctrine is not of peculiar significance to maritime law.[8] Indeed, if the rule can be fitting in a cargo damage suit, *a fortiori,* it should be controlling in this case. In the for-

5. The court in *Muller* specifically recognized that parties by agreement cannot oust the jurisdiction of an otherwise competent tribunal.

6. In some cases it would seem comparatively easy to find that when entering into an exclusive forum agreement the parties were motivated primarily by a desire to oust a court of its jurisdiction. See, e. g., United States ex rel. M.G.M. Constr. Co. v. Aetna Cas. & Sur. Co., 38 F.R.D. 418 (N.D.Cal.1965), where the effect of the contract term, if enforced, would have been to limit suit to state courts in a particular section of California while prohibiting litigation in the federal court sitting in the same area. However, at least one judge refused to consider a provision of this nature invalid *per se.* See General Elec. Co. v. City of Tacoma, 250 F.Supp. 125 (W.D. Wash.1966).

7. The parties neither briefed nor argued the choice of law questions involved in this case. It can be observed, however, that the translation of the contract suggests that the agreement was executed in Santiago, Chile. Furthermore, the prospective performance contemplated by the parties was centered in that Republic. Therefore, applying the common traditional tests for contract actions (see generally 15A C.J.S. Conflict of Laws §§ 11(1)–11(4)) or the "grouping of contacts" theory espoused by the Second Restatement of Conflicts, it seems from the record as it now stands that Chilean law is governing.
   Since no relevant aspects of that law have been cited, a state court considering this motion to dismiss would presume that the rule in Chile is identical to the

Michigan position. See Knapp v. Knapp, 95 Mich. 474, 55 N.W. 353 (1893); Crane v. Hardy, 1 Mich. 56 (1848). Moreover, by the failure of either of them to give notice pursuant to Fed.R.Civ.P. 44.1, the parties have in effect agreed that the substance of Chilean law should not be considered in connection with the motion. See Miller, Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine, 65 Mich.L.Rev. 615, 645–49 (1967). With the matter in this posture, there is no need to pursue the question whether the law of the contract has any significance respecting the enforceability of an exclusive forum clause or whether local principles alone are controlling.

8. See note 3 supra. The reasonableness test seems to have been advocated by the authors of the Restatement of Contracts long before *Muller* was decided. See Id. § 558.
   It is difficult to determine what constitutes the majority view among state courts which have considered the present problem recently, many of them in non-maritime contexts. The *Muller* rule was approved in Pennsylvania (Central Contracting Co. v. Youngdahl & Co., 418 Pa. 122, 209 A.2d 810 (1965)) but rejected in Florida (Huntley v. Alejandre, 139 So.2d 911 (Fla.App.1962)). The law in Massachusetts remains unclear. See Cadillac Automobile Co. of Boston v. Engeian, 339 Mass. 26, 157 N.E.2d 657 (1959). In support of their belief that New York follows the older rule, plaintiffs cite Kyler v. United States Trotting Ass'n, 12 A.D.2d 874, 210 N.Y.S. 2d 25 (1961). However, there is good reason to think that *Kyler* would not

mer, the contact between the specified forum country and the controversy generally lies in nothing more than the fact that a vessel owner is headquartered there and, at most, in the fact that the freight was loaded there. Here the disagreement grows out of events preparatory to and in contemplation of extracting the natural resources of the territory wherein the parties originally proposed to settle their differences.[9]

■■ The reasonableness test is the appropriate one; the remaining concern is whether the instant clause passes. Apparently everyone who could establish what defendant has done toward carrying out his part of the bargain would be in Chile. It seems that Chilean law governs the respective rights under the contract.[10] Moreover, as counsel recognize, the real meaning of much of the agreement depends to some extent at least upon customs prevalent in that country's mining industry. Here again testimony of South American residents will be helpful in reaching a just disposition. In short, honoring the exclusive forum covenant is eminently sensible.

■ Plaintiffs argue that granting the motion would be prejudicial, even though they would not be foreclosed from reinstituting proceedings in Chile, because there are now available by virtue of the garnishment funds which could be used to satisfy a favorable judgment; whereas if the money is released from the court's control, they may have to roam two continents to locate property to make victory meaningful. However, the precise inquiry at this juncture is where the conflicting contentions on the merits should be litigated and not whether the writ against the bank should be dissolved. Moreover, any possibility that there will arise difficulties of the kind which plaintiffs envision can be eliminated by a stipulation, signed by all interested parties, maintaining the garnishment in effect or by defendant's posting a satisfactory bond. See Carbon Black Export, Inc. v. The S.S. Monrosa, 254 F.2d 297, 299 n. 2 (1958).[11]

An order may be prepared directing dismissal of this case without prejudice, containing an equitable provision designed to ensure the speedy and convenient payment of any award entered for plaintiffs by an ordinary court of the Republic of Chile.[12]

---

be followed in a situation like the present one where none of the principal litigants is a domiciliary of the state. See Schwartz v. Zim Israel Nav. Co., 15 Misc. 2d 576, 181 N.Y.S.2d 283 (Sup.Ct.1958).

9. While a clause specifying a court in one country would not be unreasonable merely because the transaction in dispute was more substantially connected with another, a showing of significant contacts with the territory of the stipulated forum serves to overcome a natural reluctance to decline jurisdiction in favor of a tribunal in a foreign land which is also the defendant's domicile. Cf. Sociedade Brasileira De Intercambio Commercial e Industrial, Ltda. v. S.S. Punta Del Este, 135 F.Supp. 394 (D.N.J.1955).

Plaintiffs point to defendant's establishing a bank account in Detroit as evidence that he did not "eschew contact with the United States and its institutions." This observation only suggests

that it is fair for this court to assert jurisdiction over defendant. It sheds no light on the reasonableness of the means which he adopted to ensure as best he could that he would not become involved in a prolonged engagement with one of these institutions, the American judiciary.

10. See note 7 supra.

11. After Hussein Keilani had intervened to claim sole ownership of the garnished account (see note 1 supra), Nazem Keilani filed a disclaimer of any interest in the fund. Unless blood is thicker than money as well as water, it seems unlikely that Hussein will consent to maintain the garnishment.

12. Since the court is declining to exercise its jurisdiction over the merits of this case, it would be inappropriate for it to rule on defendant's motion for summary judgment.