JACK WINTER, INC., a corporation, Plaintiff,

v.

KORATRON COMPANY, Inc., Defendant, and Consolidated Cases.

OXFORD INDUSTRIES, INC., Wright Manufacturing Company, corporations, Plaintiffs,

v.

KORATRON COMPANY, Inc., a corporation, et al., Defendants.

Civ. A. Nos. 49392, 47273, 49558, 49671, 49913, 50063, 50827, 50854, 51281, 51301, 51650, 51653, 51654, 51691.

United States District Court, N. D. California, San Francisco Division.

March 9, 1971.

See also D.C., 50 F.R.D. 225.

Brobeck, Phleger & Harrison, by Moses Lasky, Robert S. Daggett, Richard C. Wydick, San Francisco, Cal., Lyon & Lyon, by James W. Geriak, Los Angeles, Cal., for Koratron Co., Inc.

King & Spalding, by Charles M. Kidd, Atlanta, Ga., for Oxford Industries, Inc.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

### I. BACKGROUND FOR THIS MOTION

On or about August 1, 1964, plaintiff, Oxford Industries, Inc., (a garment manufacturer) entered into an agreement with defendant, Koratron Company, Inc., the wholly-owned subsidiary of defendant, Koracorp Industries, Inc., to license Koratron's permanent press process. This 1964 license agreement alleg-edly contained a provision in which Koratron agreed to give Oxford the benefit of any more favorable license agreement granted to any other licensee and covenanted to notify Oxford promptly of any such more favorable license agreement.

On or about October 14, 1965, defendant Koratron entered into an agreement with Dan River Mills, Inc. (a fabric manufacturer), in which Koratron allegedly agreed to grant in effect a royalty-free license to Dan River and to garment manufacturers purchasing cloth from Dan River. It is alleged that Koratron did not notify Oxford of this more favorable agreement, but to the contrary, had agreed with Dan River that neither party to the "secret" agreement would make any disclosure of it.

On or about March 20, 1968, Koratron issued a press release announcing the existence of and to some extent describing the nature of the 1965 Dan River agreement. Copies of said press release were mailed by Koratron, on or about that date, to all of the United States garment manufacturer licensees of Koratron, including Oxford Industries, Inc. Thereafter, the 1965 Dan River agreement was the subject of news articles which appeared in the *Daily News Record* on April 3, 1968, and in the *Woman's Wear Daily* on April 4, 1968—trade journals which are commonly known as the two most widely read periodicals of the garment industry.

Thereafter, in mid-1968, Koratron and Oxford entered into a new form of patent license agreement which supplanted the old one. In this so-called old patent license agreement which governed the relations of the parties between 1964 and mid-1968, there was a provision that disputes arising thereunder were to be resolved by arbitration in San Francisco. The new agreement also provided for arbitration, but stipulated in addition thereto that

> [If] either party elects, by written notice to the other, that the controversy or claim should be resolved by suit or action in court, in which event such

suit or action shall be brought only in a court of competent jurisdiction, state or federal, sitting in San Francisco, California. Licensee agrees to accept venue in California. * * *

Oxford sued Koratron and Koracorp in the County Court of Fulton, Georgia, in February of 1969. Its complaint was limited essentially to a claim for breach of contract based on the contention that the 1965 Dan River agreement gave Oxford a right to a lesser royalty under the "most favored royalty" provisions of its license with Koratron, and that Koratron had fraudulently failed to disclose the agreement to Oxford. A month later the action was removed from Fulton County to the federal court at Atlanta. Then, in May of 1969, Koratron and Koracorp filed motions in the Georgia federal court, asserting, among other things, that Koratron should be dismissed for lack of jurisdiction under Rule 12(b) (2), or that, since Oxford has agreed in its license to sue only in San Francisco, the action must be transferred to this Court pursuant to the mandatory provisions of 28 U.S.C. § 1406, and, in any event, should be transferred under the discretionary provision of § 1404(a). Before that court heard the motions, the case was transferred to this Court for pretrial purposes by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. Then, in February of 1970, after certain discovery was completed, Oxford amended its complaint to allege that Koratron and Koracorp had misused Koratron's patent rights, had obtained the patent in question by fraudulent misrepresentation on and failure to disclose certain pertinent information to the patent office, that Koratron and Koracorp have violated Sections 1 and 2 of the Sherman Act, and that the patent was invalid for various other reasons. We have heretofore denied the motion of Koratron to quash the service. Our holding was that Koratron was transacting business in Georgia.

All of the questions raised by defendants' present motions have been decided by this Court, except for the issue whether the provision in the license agreement requiring litigation (if either party elects litigation) in a court of competent jurisdiction in San Francisco, California should be enforced.

## II. JURISDICTION OF THIS COURT TO DETERMINE THE PRESENT PENDING MOTIONS

Oxford submits that it has not waived its right to contest the Transferee Court's jurisdiction to decide a Motion to Transfer under 28 U.S.C. § 1404. The basis for the present motion to transfer is the contract between the parties providing for venue of the action to be laid in a court of competent jurisdiction in San Francisco, California. 28 U.S.C. § 1406 is relied on.

The contention that this Court, as transferee court under § 1407, lacks jurisdiction to determine either such motion is answered by the response of the Judicial Panel on Multidistrict Litigation to a similar contention (that a transferee court has no jurisdiction to decide a class action question):

> namely, that pretrial, as an adjective, means before trial—that all judicial proceedings before trial are pretrail proceedings. This is known not only by lawyers and judges, but is known or can be readily learned by laymen. See Random House Dictionary of the English Language, unabridged ed. 1141. See also "Pretrial Calendar" 33 Words and Phrases, p. 511.

We take the position that the issue is properly before us.

## III. THE GENERAL VALIDITY OF A CONTRACTUAL PROVISION LIMITING PLACE OR COURT IN WHICH ACTION MAY BE BROUGHT

The traditional and the numerical majority rule as to validity of such a stipulation is stated in Annot., 46 A.L.R.2d 300, 306 (1957):

> In what would appear to be a majority of jurisdictions (and by what is clear-

**124**

ly the numerical weight of the decisions), contractual agreements by which it is sought to limit particular causes of action which may arise in the future to a specified court, or to a court or courts in a specified place, are held invalid, or, at least, they are not viewed as barring litigation of the causes in courts or places different from those specified in the agreements.

*See* cases cited, *Id.*, and Later Case Service (1967).[1] The basis of the holdings appears to be that such agreements are contrary to public policy, as attempts to oust the jurisdiction of the courts (or certain courts).

However, in what is now a leading case on the subject, Wm. H. Muller & Co. v. Swedish American Line, Ltd., 224 F.2d 806 (2d Cir. 1955), the court sustained a contractual provision purporting to limit jurisdiction of "[a]ny claim against the carrier arising under this bill of lading," to the Swedish courts. In so doing the court accepted the conclusion of Judge L. Hand stated in his concurring opinion in Krenger v. Pennsylvania R. Co., 174 F.2d 556, 561 (2d Cir. 1949):

> In truth, I do not believe that, today at least, there is an absolute taboo against such contracts at all; in the words of the Restatement (of Contracts, § 558), they are invalid only when unreasonable * * *.

Although the *Muller* case itself has been overruled, because of its inconsistency with the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315, by Indussa Corp. v. S.S. Ranborg, 377 F.2d 200 (2d Cir. 1967), many authorities hold that its rationale as to venue of actions is still good and highly persuasive where COGSA does not apply. *See, e. g.,* Geiger v. Keilani, 270 F.Supp. 761, 764 n. 3

(E.D.Mich.1967). Indeed, a substantial number of cases have followed the *Muller* decision. *See* Central Contracting Co. v. Maryland Cas. Co., 367 F.2d 341 (3d Cir. 1966); Goff v. AAMCO Automatic Transmission, Inc., 313 F.Supp. 667 (D.Md.1970); A. C. Miller Concrete Prod. Corp. v. Quikset Vault Sales Corp., 309 F.Supp. 1094 (E.D.Pa.1970); Matthiessen v. National Trailer Convoy, Inc., 294 F.Supp. 1132 (D.Minn. 1968); National Equipment Rental, Ltd. v. Sanders, 271 F.Supp. 756 (E.D.N.Y. 1967); Geiger v. Keilani, 270 F.Supp. 761 (E.D.Mich.1967); General Electric Co. v. City of Tacoma, 250 F.Supp. 125 (W.D.Wash.1966); Hernandez v. Koninklijke Nederlandsche Stoomboot Maat., 252 F.Supp. 652 (S.D.N.Y.1965); Pakhuismeesteren, S.A. v. S.S. Goettingen, 225 F.Supp. 888 (S.D.N.Y.1965); Euzzino v. London & Edinburgh Ins. Co., Ltd., 228 F.Supp. 431 (N.D.Ill.1964); Takemura & Co. v. The S.S. Tsuneshima Maru, 197 F.Supp. 909 (S.D.N.Y.1961). *See also,* National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 315–316, (opinion of the court), 326–327 (Black, J., dissenting), 84 S.Ct. 411, 11 L.Ed.2d 354 (1964).

Under this view, the Court may in its discretion refuse to assert its jurisdiction if, upon the facts of the case before it, the agreement does not appear unreasonable. In answer to the argument that a forum agreement is necessarily an attempt to oust the jurisdiction of the court, it was said in Geiger v. Keilani, *supra,* 270 F.Supp. at 765:

> With this proposition[2] there can be no quarrel. However, the very fact that it is so well established tends to reduce its value, since parties to an exclusive forum arrangement are unlikely to intend a purpose which they must realize cannot be achieved. Therefore, in drafting their agreement they would normally mean not to deprive some courts of jurisdiction but to express

1. We, of course, do not consider the question whether the clause bars litigation in Georgia. Undoubtedly the parties could agree to waive the stipulation.

2. The specific proposition addressed was that quoted in text accompanying note 3 *infra.*

their desire that these courts relinquish jurisdiction in deference to what was at least originally the belief that suits could be better or more conveniently tried someplace else.

The United States Court of Appeals for the Third Circuit, in adopting this view, has referred to it as the modern and correct rule. Central Contracting Co. v. Maryland Cas. Co., *supra*, 367 F.2d at 344 n. 3 & 345. And in a thorough defense of the so-called modern rule, Judge Wisdom, dissenting in In Re Unterweser Reederei, GMBH, 428 F.2d 888 (5th Cir. 1970), stated that he cannot believe "that jurisdictional ouster is a real issue." *Id*. at 905.

However, the modern trend, if there be one, is not by any means unanimous. In Carbon Black Export, Inc. v. The S.S. Monrosa, 254 F.2d 297 (5th Cir. 1958), the Fifth Circuit reversed a district court order declining jurisdiction on the basis of the *Muller* decision. In considering the forum agreement involved therein, the court said:

> Any consideration of such a question starts with the universally accepted rule that agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced.[3]

The court distinguished the *Muller* decision on its facts, thus finding it unnecessary to espouse or reject the position taken by the Second Circuit in that case.

More recently the Fifth Circuit has reaffirmed its position regarding this issue by relying on *Carbon Black* to conclude

> that the forum selection clause [there involved], in and of itself, did not

compel the district court to stay proceedings in [the action before it] so that the parties might litigate in England pursuant to its provisions.

In Re Unterweser Reederei, GMBH, 428 F.2d 888, 894 (5th Cir. 1970).[4]

Judge Wisdom's dissent in *Unterweser* demonstrates persuasively that the mechanical and automatic outlawing of forum stipulation is erroneous both historically and analytically. The Judge concludes from his analysis that

> [w]hat does emerge from the history, the cases, and the commentary is a legitimate concern for the bargaining conditions in which the forum agreement was made and the quality of the remedy available to the parties if the agreement is enforced.

*Id*. at 905. He lists the following relevant factors which reflect the two concerns and should be considered by a court in determining whether the specific forum agreement at issue is reasonable and should be enforced:

> (1) Did the parties freely and intelligently enter their agreement?
> \* \* \*.
>
> (2) Would the stipulated forum in rendering its decision transgress an important public policy of the present forum?
> \* \* \*.
>
> (3) Will the designated forum adjudicate the parties' dispute?
> \* \* \*.
>
> (4) Is the designated forum seriously inconvenient for the trial of the action?

*Id*. at 906. With regard to the last factor, the Third Circuit has adopted the

---

3. *Id*. at 300–301. The agreement there in question provided:

> Clause 27—Also, that no legal proceedings may be brought against the Captain or ship owners or their agents in respect to any loss of or damage to any goods herein specified, except in Genoa, it being understood and agreed that every other Tribunal in the place or places where the goods were shipped

or landed is incompetent, notwithstanding that the ship may be legally represented there.

*Id*. at 299. This language is such that it is subject to a holding that it manifests intent to "oust the jurisdiction" of otherwise competent courts.

4. The dissenting opinion of Judge Wisdom sets forth the defense of the so-called modern rule which is mentioned above.

126

language of the Supreme Court of Pennsylvania:

> Such an agreement is unreasonable only where its enforcement would, under all circumstances existing at the time of litigation, seriously impair plaintiff's ability to pursue his cause of action. Mere inconvenience or additional expense is not the test of unreasonableness since it may be assumed that the plaintiff received under the contract consideration for these things. If the agreed upon forum is available to plaintiff and said forum can do substantial justice to the cause of action then plaintiff should be bound by his agreement.

Central Contracting Co. v. Maryland Cas. Co., 367 F.2d 341 (3d Cir. 1966), quoting Central Contracting Co. v. C. E. Youngdahl & Co., Inc., 418 Pa. 122, 133, 209 A.2d 810, 816 (1965).

## IV. OXFORD'S OTHER CONTENTIONS

Oxford contends that either Georgia law or California law should govern disposition of this question. (The license agreement provides that California law should govern any disputes arising out of the agreement.) There is no basis for concluding that Georgia law applies in this instance, and, as to the application of California law we are not convinced that California would not follow the modern rule discussed above. In the California case relied on by Oxford, the court said:

> [B]ut, in the event that the parties stipulate (to the forum), their stipulation will have no force or effect *unless the trial court sees fit to make an order changing the place of trial in accordance with the stipulation of the parties.*

General Motors Acceptance Corp. v. Codiga, 62 Cal.App. 117, 216 P. 383, 384 (1923). In any event, we agree with Chief Judge Freeman in Geiger v. Keilani, *supra*, 270 F.Supp. at 765, that

> [w]hile it would probably be possible to write at length about whether a federal court in a diversity case should apply state law in resolving the question at hand, such a discussion would be of only academic significance in the present context.

■ Oxford recognizes, to some extent at least, that courts do not under all circumstances, as a matter of public policy, refuse to consider or enforce a forum stipulation. It seeks, for example, to show that the agreement was a result of Koratron's misrepresentation,[5] and Oxford would also have us determine from the facts that Georgia would be the more convenient forum.[6] However,

5. Oxford contends that the forum agreement involved herein was not freely entered into, in that it was fraudulently induced by Koratron's nondisclosure. The thrust of this is that Koratron fraudulently failed to disclose to Oxford the existence of the 1965 Dan River agreement which allegedly was in breach of the license agreement between Oxford and Koratron, at the time the 1968 superseding agreement was consummated. The complaint is that Koratron intentionally inserted the San Francisco forum agreement provision in order to deter Oxford from suing on a breach of contract action which Koratron knew existed at the time, but of which Oxford had no knowledge (or adequate knowledge). However, it appears from the affidavits submitted by Koratron, Oxford did have knowledge of the 1965 Dan River agreement at the time the 1968 "amended agreement" was negotiated and consummated by Oxford and Koratron. *See*, text, p. 122 *supra*. And it appears from the content of the notice given to Oxford that their knowledge was sufficient to discredit the claim that the forum agreement provision was induced by fraud.

6. While it is undoubtedly true that many of Oxford's witnesses reside in Georgia, as many, if not more, witnesses reside in California. Since Koratron's patent involved in this action has been granted to licensees all over the country, it is not unreasonable for them to seek, and to have sought, to have claims arising out of the use of this patent litigated in one place—namely, their principal place of business. And since many suits involving the same issues are in fact pending against Koratron in the Northern District of California, it appears to us not unrea-

the evidence presented does not substantiate these claims, and it is not apparent that this stipulation transgresses any public policy in either Georgia or California. Beyond that it does not appear that the federal court in California will not fairly and competently determine the issues in the case. Nor can it be said that there is inconvenience in the true sense granting, of course that there is always inconvenience to somebody when a case is transferred or where transfer is refused. Here, however, there is no great number of witnesses, and the central question is validity and enforceability of Koratron's '432 patent.

Still a further factor peculiar to the present case is that the choice is not between a local court and some foreign tribunal. Where the stipulation threatens to oust a local court in favor of a Swedish or Swiss or even English tribunal, the policy considerations loom larger, and a judge understandably feels that he is shirking his duty when he sends the hapless litigant to some foreign port beyond the Seven Seas where the nature and quality of the justice may well be uncertain and unpredictable. On the other hand, the federal courts are part of a national system within which there is every reason to expect that the quality of justice will not differ substantially in different districts. Hence, these imaginary horribles do not rise up. And here, in addition, the problem presents itself in the course of pretrial proceedings pursuant to § 1407, and the evaluation has to be influenced by the policy of this law which is in part at least avoidance of duplication and conflict as well as classification and simplification of issues. Thus, there are at the present time nine cases in the Northern District of California which have issues substantially identical with the ones which are raised in the Oxford case. It is desirable that there be a prompt trial on the merits and equally prompt appeal or appeals involving a

sonable, all other factors considered, to enforce the forum agreement. There is no doubt but that this forum can do

substantial number of cases. It is to be hoped that such a trial and decision may furnish a pattern for disposition of the remaining cases, whereby duplicating efforts may be avoided.

Influenced then by these basic considerations, plus the particular vantage point from which we view the case, it is our conclusion that the transfer motion of Koratron should be and the same is hereby granted.